OPINION
{¶ 1} In Case No. 1-06-46, Defendant-Appellant, Ontrayis Keith, appeals the judgment of the Allen County Court of Common Pleas wherein Keith entered a plea of guilty to one count of escape in violation of R.C. 2921.34(A)(1),(C)(2)(a), a felony of the second degree. In Case No. 1-06-53, Keith appeals the judgment of the Allen County Court of Common Pleas convicting him of one count of aggravated robbery with a firearm specification. On appeal, Keith argues that the trial court erred in overruling his motion to suppress; that the trial court erred in overruling his motion to exclude testimony; and, that the trial court erred by allowing the State to use hearsay testimony. Because Keith failed to raise any assignments of error with regards to Case No. 1-06-46, the cause in Case No. 1-06-46 is dismissed. Additionally, finding that the *Page 3 
trial court did not err in overruling Keith's motion to suppress and motion to exclude testimony and that the trial court properly admitted the questioned testimony, in Case No. 1-06-53, we affirm the judgment of the trial court.
 {¶ 2} In January 2005, the Allen County Grand Jury indicted Keith on two counts of aggravated robbery in violation of R.C. 2911.01(A)(1), both felonies of the first degree. Additionally, both counts of the indictment included firearm specifications under R.C. 2941.145(A). The charges stem from two robberies that occurred on December 1, 2004 in Lima, Ohio. Specifically, the first count was based on Keith's alleged robbery of Crazy's Wings Things (hereinafter referred to as "Crazy's") in Lima, Ohio, and the second count was based on Keith's alleged robbery of Lynn's Pawn Shop (hereinafter referred to as "Lynn's") in Lima, Ohio. Keith entered pleas of not guilty to both counts.
 {¶ 3} In March 2006, Keith waived his right to a speedy trial and moved to suppress all of the various eyewitnesses' identifications of him, because their testimony was illegally obtained out of court.
 {¶ 4} In May 2006, the trial court held a hearing on Keith's March 2006 motion to suppress. At this hearing, Keith called Detective Don Marik, a detective with the Lima Police Department, to testify as if on cross-examination. Detective Marik testified that he was the lead detective on this case; that there was a videotape obtained from Lynn's, which depicted the robbery (hereinafter this *Page 4 
videotape is referred to as "the videotape"); that prior to apprehending any suspects, the videotape was provided to the local television stations in Lima in order to broadcast the robbery on their nightly news broadcasts; that the videotape was given to the television stations to see if anyone from the general public might recognize the individuals involved in the robbery; that after the television stations played the videotape, Diana Ross[1], a janitor at the police department, viewed the videotape footage played on the television and identified Keith as one of the two persons involved in the Lynn's robbery; and, that Joy Williams, a customer at Lynn's, and other anonymous persons identified Keith as one of the two persons involved in the Lynn's robbery.
 {¶ 5} Detective Marik also testified that a day after Crazy's was robbed, Bruce Bradshaw, the owner of Crazy's, came to the police station and viewed the videotape to determine whether any perpetrators looked familiar; that he initiated contact with Bradshaw; that Bradshaw indicated that the two individuals in the videotape were the same two individuals that robbed him hours before; that he showed the videotape to Bradshaw two or three times; and, that Bradshaw was quite certain the first time he saw the videotape that the same individuals had robbed him. At the conclusion of the hearing, the trial court denied Keith's motion to suppress. *Page 5 
 {¶ 6} In June 2006, a jury trial was held, during which the following testimony was presented:
 {¶ 7} Bradshaw testified that on December 1, 2004, at approximately 9 a.m., he was working alone at Crazy's and a man came into the store and purchased a fruit punch; that at approximately 10:30 a.m., the same man came back to the store and while he was greeting this customer, another man appeared from hiding; that the man, who appeared from hiding, was wearing a hooded sweatshirt with the hood pulled up, sunglasses, and a rag on his head, pointed a pistol at him, and asked for all of his money; that he was within six feet of the man pointing the pistol at him; that he handed the cash register drawer to the man who was in the store earlier; that he believed the cash register drawer contained $170.00; that he activated his alarm system in the store; and, that the man to whom he handed the cash register drawer left the store and the man with the pistol fired it at him before leaving. Bradshaw continued that he later was able to identify one of the men from the videotape and that the same two men who robbed him were on the videotape.
 {¶ 8} On cross-examination, Bradshaw testified that he saw the man who pointed the gun at him, but did not remember what color pants the man was wearing; that he had to open the cash register for the men and handed the drawer *Page 6 
to the man without the gun, who was standing in front of him; and, that he noticed a facial tattoo on the man to whom he handed the cash register drawer.
 {¶ 9} Bradshaw also indicated that he has never identified the man with the gun other than noticing he was on the videotape; that the police never showed him a photo lineup or took him to a lineup to identify the person who had the gun; that he previously testified in the case of the other robber; that he believed both men were the same height; that he became aware of the robbery at Lynn's, because he watched the video of the robbery on television; that he was also called by Detective Marik, who asked him to come to the police station to view the videotape, to see if he recognized the two people on the videotape; and, that the men on the videotape appeared to use the same gun and were dressed the same.
 {¶ 10} On redirect examination, Bradshaw indicated that he did not know whether the two men who robbed him were the same height and that the man to whom he handed the cash register drawer was previously inside the store and had purchased a beverage.
 {¶ 11} I.D. Officer David Michael Hammond, an identification officer with the Lima Police Department, testified that on December 1, 2004, he was called out to Crazy's to process a crime scene; that once he got to the scene, he interviewed the officers about what the victim had told them, took pictures of and notes about the crime scene, performed trajectory work on the bullet hole from the gun shot, *Page 7 
and performed some fingerprint work; that he found a latent palm print on the cash register and other fingerprints on the cash register and counter; that the Lima Police Department has a local automated fingerprint identification system (hereinafter referred to as "the AFIS"), which contains about 4,600 sets of fingerprints; and, that he scanned a latent palm print, which was less than one quarter of a full palm print, into the AFIS, and it returned one candidate.
 {¶ 12} After Keith objected to the testimony about the AFIS, Officer Hammond described how the AFIS works, how the F.B.I. has approved the AFIS, how to scan in a fingerprint, what the AFIS does with the scanned image, and how he was trained on the AFIS. Keith then objected again and the trial court answered, "The court's had other cases and the court's aware of the reliability of this particular machine. And the court finds based upon the testimony that it meets the qualifications ofDaubert and State v. Bike and therefore will allow the state to proceed." (Tr. p. 276) (emphasis in original).
 {¶ 13} Officer Hammond continued that the AFIS provides a score between 0 and 10,000 as to the possibility that it matches a candidate; that 10,000 is the best possible score; and, that Keith's palm print matched the latent palm print found at Crazy's with a score of 8,400; that the latent palm print and Keith's palm card provided ten matching points of comparison; that a positive identification for the F.B.I. typically requires six matching points of comparison; and, that he *Page 8 
identified Keith as the person who made the palm print on the cash register at Crazy's.
 {¶ 14} On cross-examination, Officer Hammond testified that he lifted a number of fingerprints from the counter area and one from the cash register tray, which did not match Keith's fingerprints; that the angle of the gun shot was downward between 15 and 30 degrees; that the gun shot was approximately 10 to 15 feet from the counter and approximately 10 feet inside the front door of Crazy's; that a gun was never recovered in this case; that the AFIS matched 43 points of comparison on the latent palm print and Keith's palm print, while he only matched ten points of comparison; and, that it is his opinion, based on his training and experience, that the latent palm print found on the cash register was Keith's.
 {¶ 15} Lynn Lamb, the owner of Lynn's, testified that in the afternoon of December 1, 2004, two male customers came into her store; that the taller of the men started to deal on a piece of jewelry, while the shorter man scoped out the shop; that the shorter man pulled a gun on her and demanded money out of the register, which she gave him, while the taller man broke the jewelry cases and took some jewelry; that the taller man instructed the shorter man to tie her up, which he did with speaker wire; that the men took over a thousand dollars in cash and over $18,000 worth of jewelry at her cost; that the men were in their twenties; *Page 9 
that she thought Keith "sure looks like" one of the men who robbed the store (tr. p. 313); that Lynn's had a surveillance system and recorded the robbery; and, that she gave the videotape to the police.
 {¶ 16} On cross-examination, Ms. Lamb indicated that she first identified Keith at a pre-trial hearing for Shaiton Andrews[2] after the robbery; that the shorter of the men was wearing baggy blue jeans pants, a blue jean jacket, and a blue bandana; and, that the shorter of the two men was very polite and had a broad nose.
 {¶ 17} Officer Hammond was recalled and testified that he was also called to the robbery scene at Lynn's; that he photographed the scene and processed the scene for fingerprints; that he had the speaker wire collected as evidence; and, that he did not find any fingerprints, which matched Keith's.
 {¶ 18} Detective Marik testified that he was given the videotape and conducted his investigation with the aid of the videotape; that the videotape was taken to several media outlets in the Lima area in order for the videotape to be played on their newscasts; that he was hoping to learn the identity of the perpetrators; and, that there was something on the news broadcasts that requested people to contact the police department with any information on the suspects. *Page 10 
 {¶ 19} Detective Marik continued that the day after the videotape was played, he received the same information from two individuals, which indicated who the two suspects in the robbery at Lynn's were; that he already had Andrews, who was the taller perpetrator, in mind as a suspect from dealing with him over a number of years; that he thought the second perpetrator in the videotape was Keith, but wanted a second opinion, which was confirmed through the information that came into the police department; that after he found a picture of Keith and watched the videotape several times, he was able to identify the shorter perpetrator as Keith; that before watching the videotape, he "never had any dealings with [Keith]" (tr. p. 354); that after he determined that Keith was a suspect, he had several agencies looking for him in Allen County, but they were unable to locate him; that he received information from Crime Stoppers that Keith was in Indianapolis, Indiana; and, that Keith was apprehended in January 2006.
 {¶ 20} On cross-examination, Detective Marik indicated that he was the lead detective on the case; that he assumed Keith fled the area, because he was unable to find him; that by viewing the videotape, he was able to determine that Keith was the second offender; that he was able to make this determination after he viewed a photograph of Keith and watched the videotape "several times" (tr. p. 364); that he searched the home where Andrews was living and found a skullcap in the residence and the jacket Andrews was wearing in the videotape in a garbage *Page 11 
can two houses down from where he was staying; that he did not find any clothing or other items, which belonged to Keith; that the person who held the gun to Bradshaw at Crazy's was wearing a skullcap; that he did not process the skullcap that was found for hair or DNA samples, because he did not feel that it was necessary; that he received a lead that the suspect on the videotape with Andrews was someone other than Keith, but he did not follow up on that lead; that he did not follow up on that lead because he was sure that Keith participated in the robbery at Lynn's; that he was not aware that Keith has cousins who closely resemble him and that a patrolman pulled over one of Keith's cousins thinking he was Keith; that there were no useable palm or fingerprints found at Lynn's; that he did not have the house where Andrews was staying checked for palm or fingerprints; that he did not check the items found related to the robbery for Keith's fingerprints; that he did not use either a photo or a person lineup to allow Lamb or Bradshaw to identify Keith; that he did not use a photo lineup, because the photograph he had was not a good photograph and Keith was apprehended thirteen months after the robberies; and, that he was concerned with Bradshaw and Lamb's ability to pick Keith out of a lineup thirteen months after they were robbed.
 {¶ 21} Detective Marik also noted that he showed the videotape to Bradshaw the day after the robbery occurred at Crazy's; that he contacted *Page 12 
Bradshaw and informed him that he had a couple of people on a surveillance video who robbed a store the same day that Crazy's was robbed; that Bradshaw indicated to him that he was very sure that the same two individuals who were on the videotape were the same two individuals that robbed him just hours before; and, that Bradshaw has never identified Keith in any other way other than watching the videotape.
 {¶ 22} On redirect examination, Detective Marik testified that when the police know who the suspects are, they will not send evidence away for DNA testing; that he received information from Keith's Sister, Tarissa Ross, and Keith's Mother, Diana Ross, which made him believe that Keith was involved in these robberies. Additionally, Detective Marik testified that Andrews and Tarissa were boyfriend/girlfriend.
 {¶ 23} Jim Szeremeta, a parole officer with the Ohio Department of Corrections, testified that he first met with Keith on November 14, 2001, in his office; that he viewed the videotape on December 2, 2004, after Detective Marik contacted him; that he recognized Keith on the videotape; that he has no doubt that Keith was the man who went behind the counter and produced the handgun; and, that on December 3, 2004, he set up surveillance on Keith's last known residence, but was unable to find Keith. *Page 13 
 {¶ 24} After Szeremeta testified, Keith renewed his motion to dismiss the robbery charge dealing with Crazy's on the improper showing of the videotape to Bradshaw, because Detective Marik used unduly suggestive procedures and moved under Crim.R. 29 for acquittal. The trial court overruled both motions.
 {¶ 25} James Ed Monfort, a Drug Court Coordinator in Lima, testified that he was a police officer for the City of Lima for a total of 25 years, nineteen years as a detective with the detective bureau and five years as an identification officer with in the identification bureau; that Officer Hammond took his position when he retired; that he helped train Officer Hammond; that he analyzed finger and palm prints while he was an identification officer for the City of Lima and considers himself an expert in finger and palm print analysis; that he compared the palm print found at Crazy's with Keith's prints that were on file with the police department; that he saw only eight points of comparison; that the rule of thumb used both at B.C.I. and the Lima Police Department is that you need ten points of comparison for a positive match; and, that based on his experience, he could not positively identify the palm print found at Crazy's as Keith's. Monfort also testified that if he had a full palm print instead of a partial palm print, it would make identification a lot easier and that he did not believe there was sufficient evidence to indicate that the palm print found at Crazy's was Keith's. *Page 14 
 {¶ 26} On cross-examination, Monfort indicated that he has been retired from the police department for five years; that he believes Officer Hammond is a pretty good identification officer; that it had been three years since he compared a fingerprint; that he spent three to four hours looking at the palm print; that it is possible that if he could have spent more time looking at the palm print, he might have been able to perform a more thorough job; that he has never heard anything negative about the AFIS machine; that his opinion was that there were only eight points of comparison, but that his opinion does not make Officer Hammond's ten points of comparison determination wrong; that he did not find anything on the palm print, which indicated that the palm print was not Keith's; and, that the F.B.I. requires less than eight points of comparison to consider a palm print a match.
 {¶ 27} Earl Foster, Keith's cousin, testified that he has been mistaken for Keith and that a few months after the robberies, he was pulled over and mistaken for Keith by the Lima Police Department. On cross-examination, Foster indicated that he did not rob Lynn's on December 1, 2004.
 {¶ 28} After Foster testified, Keith rested and renewed his Crim.R. 29 motion for acquittal, which was denied. After the jury deliberated, Keith was found guilty on the first count of aggravated robbery with a firearm specification in violation of R.C. 2911.01(A)(1) and R.C.2941.145(A), a felony of the first *Page 15 
degree, and was found not guilty on the second count of aggravated robbery with a firearm specification.[3]
 {¶ 29} Keith was later sentenced to ten years in prison for his conviction of aggravated robbery and a mandatory term of three years in prison for the firearm specification to run consecutively for a term of thirteen years. Additionally, the trial court ordered that the prison term would run consecutively to an eight year prison term previously imposed on Keith in Allen County Common Pleas Court Case No. CR2006 0074, wherein Keith entered a plea of guilty to one count of escape in violation of R.C. 2921.34(A)(1),(C)(2)(a), a felony of the second degree.
 {¶ 30} It is from these judgments Keith appeals, presenting the following assignments of error for our review.
 Assignment of Error No. I Whether the Trial Court committed error prejudicial to the Defendant by overruling the motion of the Defendant to suppress out of court identification of the Defendant as the identifications made were done in such a manner as to be impermissibly suggestive so as to violate the Defendant's rights to due process.
 Assignment of Error No. II Whether the Trial Court committed error prejudicial to the Defendant by overruling the motion of the Defendant to exclude *Page 16 testimony of the State of Ohio's witness regarding the AFIS (Automated Fingerprint Identification System).
 Assignment of Error No. III Whether the Trial Court committed error prejudicial to the Defendant by allowing testimony from a Lima Police Detective by hearsay that relatives of the Defendant contacted the Police Department identifying the Defendant from news broadcasts of a video and allowing the State of Ohio in using such testimony during closing arguments to the jury in violation of Defendant's right of confrontation.
 Assignment of Error No. I {¶ 31} In his first assignment of error, Keith argues that the trial court erred in denying his motion to suppress out of court identifications. Specifically, Keith asserts that Bradshaw's identification of Keith in the videotape as one of the two men who robbed Crazy's was obtained through an impermissibly suggestive manner in violation of his due process rights. We disagree.
 {¶ 32} Appellate review of a trial court's ruling on a motion to suppress presents a mixed question of law and fact. State v. Long
(1998), 127 Ohio App.3d 328, 332. When considering a motion to suppress, the trial court assumes the role of the trier of fact and is, therefore, in the best position to resolve factual questions and evaluate the credibility of the witnesses. State v. Smith, 80 Ohio St.3d 89, 105,1997-Ohio-355; State v. Anderson (1995), 100 Ohio App.3d 688, 691. An appellate court must defer to the trial court's factual findings if they are supported by competent, credible evidence. State v. Retherford
(1994), 93 Ohio App.3d 586, *Page 17 
593, appeal dismissed, 69 Ohio St.3d 1488. Accepting the trial court's factual findings, the appellate court determines "without deference to the trial court, whether the court has applied the appropriate legal standard." Anderson, 100 Ohio App.3d at 691.
 {¶ 33} Generally, identification testimony is properly admitted unless the identification procedure was so impermissibly suggestive that there was a substantial likelihood of irreparable misidentification. SeeSimmons v. United States (1968), 390 U.S. 377; State v. Barnett (1990),67 Ohio App.3d 760; State v. Hill (1987), 37 Ohio App.3d 10. The court must consider the totality of the circumstances surrounding the identification. See Stovall v. Denno (1967), 388 U.S. 293; Foster v.California (1969), 394 U.S. 440; United States v. Burgos (C.A.4, 1995),55 F.3d 933; State v. Fanning (1982), 1 Ohio St.3d 19, 20, citingState v. Jackson (1971), 26 Ohio St.2d 74, paragraph two of the syllabus. In Neil v. Biggers (1972), 409 U.S. 188, 199-200, the United States Supreme Court set forth the following factors to be considered in examining an identification procedure and its impact:
 [W]hether under the `totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of *Page 18 certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
See, also, State v. Jells (1990), 53 Ohio St.3d 22, 27.
 {¶ 34} Before the out-of-court identification testimony is suppressed, the trial court must find that the procedure employed was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. See Barnett, supra; see, also,State v. Hill (1987), 37 Ohio App.3d 10, 14; State v. Blackwell (1984),16 Ohio App.3d 100. Moreover, although the identification procedure may have contained notable flaws, this factor does not, per se, preclude the admissibility of the identification. See State v. Merrill (1984),22 Ohio App.3d 119, 121; State v. Moody (1978), 55 Ohio St.2d 64, 67. Thus, although the identification procedure is suggestive, as long as the challenged identification itself is reliable, it is admissible. SeeManson v. Brathwaite (1977), 432 U.S. 98; Moody, supra.
 {¶ 35} Where a suspect has been confronted by a witness before trial, that witness' identification of the suspect will be suppressed if the confrontation procedure was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances. State v. Brown (1988), 38 Ohio St.3d 305, 310. The required inquiry is, therefore, two-pronged. The first question is whether the initial identification procedure was unnecessarily or unduly suggestive. Merely because a specific procedure is *Page 19 
unnecessarily suggestive does not per se render the challenged identification inadmissible. Manson, supra; Moody, supra;Merrill, supra. The second question is whether the out-of-court suggestive procedure created a very substantial likelihood of misidentification. Simmons, supra.
 {¶ 36} The defendant bears the burden of first showing that the identification procedure was unduly suggestive. State v. Beckham, 2d Dist. No. 19544, 2003-Ohio-3837 at ¶ 10. If the defendant is able to meet that burden, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure. Id., citing State v. Wills (1997),120 Ohio App.3d 320, 324. If the pretrial confrontation procedure was not unfairly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. Id.
 {¶ 37} Here, Keith asserts that the State's method was unduly suggestive because Detective Marik contacted Bradshaw, notified him that the videotape depicted a robbery that occurred the same day as the robbery at Crazy's, and wanted Bradshaw to determine whether the two men who robbed him were the same men depicted in the videotape.
 {¶ 38} Upon our review of the record, we cannot find that Detective Marik's tactics were unduly suggestive. Since Keith was not in custody when *Page 20 
Detective Marik asked Bradshaw to view the videotape, we do not see how Detective Marik's inquiry suggested that Keith was in fact the perpetrator. Also, while Keith is correct in noting that the videotape depicted a robbery, which occurred the same day as the robbery at Crazy's, we do not find that watching a video depicting a robbery would suggest that the same men actually robbed Bradshaw.
 {¶ 39} However, even assuming, arguendo, that the State's method of identification was unduly suggestive, we cannot find that under the totality of the circumstances that Bradshaw's identification was unreliable. While it is true that Bradshaw never actually identified Keith as the man who robbed him, Bradshaw noted that the man who appeared from hiding was wearing a hooded sweatshirt with the hood pulled up, sunglasses, and a rag on his head, but did not know what color pants he was wearing. Bradshaw also indicated that the man pointed a pistol at him, asked for all of his money, was standing within six feet of him, and fired the pistol at him before leaving. Bradshaw stated that the two men in the videotape were the same men who robbed Crazy's and that the men on the videotape appeared to use the same gun and were dressed the same. Additionally, Bradshaw viewed the videotape the day after Crazy's was robbed. *Page 21 
 {¶ 40} Accordingly, we find that the trial court did not err in overruling Keith's motion to suppress out of court identifications and overrule Keith's first assignment of error.
 Assignment of Error No. II {¶ 41} In his second assignment of error, Keith argues that the trial court erred in overruling his motion to exclude Officer Hammond's testimony about the AFIS. Specifically, Keith asserts that Officer Hammond was not qualified as an expert in order to testify about the procedures and results of the AFIS. We disagree.
 {¶ 42} We note at the outset that Keith has mischaracterized Officer Hammond's opinion testimony as expert testimony. A review of the trial transcript indicates that the State made no attempt during the trial to establish Officer Hammond's testimony about the AFIS as that of an expert, and the trial court made no acknowledgment of Officer Hammond as an expert witness.[4] To *Page 22 
the contrary, the State merely asked Officer Hammond to state based on his personal training how the AFIS worked. Thus, we find that Officer Hammond's testimony regarding the AFIS was a lay opinion, and review the admittance as such.
 {¶ 43} A trial court has broad discretion to determine the admissibility of lay witness opinion testimony. State v. Auerbach
(1923), 108 Ohio St. 96, 98; State v. Cooper (1985), 3d Dist. No. 8-84-31, 1985 WL 7217. Accordingly, a reviewing court will not disturb a trial court's determination on the admissibility of lay witness opinion testimony absent an abuse of discretion. Auerbach, 108 Ohio St. at 99. An abuse of discretion connotes more than an error in law or judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 44} However, the erroneous admission of lay opinion testimony "does not give rise to grounds for reversal where the opinion testimony was not [unfairly] prejudicial to the defendant or where the opinion testimony did not [unfairly] bias the jury against the defendant."State v. Quails, 3d Dist. No. 9-01- *Page 23 
07, 2001-Ohio-2296, citing Cooper, supra; see, also, Crim.R. 52(A) ("any error* * * which does not affect substantial rights shall be disregarded").
 {¶ 45} Upon our review of the record, we find that the trial court did not err in allowing Officer Hammond's testimony. As Keith properly notes, Officer Hammond testified about the workings of the AFIS and its reliability. Additionally, Officer Hammond testified that he ran the palm print found at Crazy's through the AFIS machine and it returned Keith as the only match. Officer Hammond continued that the AFIS provides a score between 0 and 10,000 as to the possibility that it matches a candidate; that 10,000 is the best possible score; and, that Keith's palm print matched the latent palm print found at Crazy's with a score of 8,400.
 {¶ 46} However, Officer Hammond also testified that he personally compared the palm print found at Crazy's with Keith's prints and matched ten points of comparison and with this comparison, based on his training and experience, he concluded that the latent palm print found on the cash register at Crazy's was Keith's.
 {¶ 47} While Officer Hammond's testimony regarding the AFIS machine involved the workings of the AFIS machine, it was only used to show his preliminary investigation into determining who made the palm print and not to prove that the palm print was actually Keith's. Officer Hammond performed an *Page 24 
actual comparison finding ten points of comparison to determine that the palm print found at Crazy's was actually Keith's. Accordingly, we find that Officer Hammond's testimony regarding the AFIS machine was not unfairly prejudicial to Keith nor did it unfairly bias the jury against the defendant and overrule Keith's second assignment of error.
 Assignment of Error No. III {¶ 48} In his third assignment of error, Keith argues that the trial court erred by allowing Detective Marik's testimony that Keith's relatives contacted the police department and identified Keith in the videotape and violated his right to confrontation. We disagree.
 {¶ 49} In Crawford v. Washington (2004), 541 U.S. 36, the United States Supreme Court addressed an issue involving the Confrontation Clause of the Sixth Amendment, which states that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Id. at 38. The question of whether a criminal defendant's rights under the Confrontation Clause have been violated is reviewed under a de novo standard. United States v.Robinson (6th Cir.2004), 389 F.3d 582, 592.
 {¶ 50} In Crawford, the defendant's wife, exercising her marital privilege, did not testify at his trial. Id. at 40. Before trial, however, in a tape-recorded statement to police, defendant's wife described the stabbing with which her *Page 25 
husband was charged. Id. at 39. The statement conflicted with defendant's claim that the stabbing was in self-defense. Id. Defendant argued that his wife's statement was not only inadmissible hearsay, but violated his Sixth Amendment right of confrontation. Id. at 40. The trial court determined that the statement, though hearsay, was reliable and trustworthy, and the jury was allowed to hear it. Id. Defendant was subsequently convicted. Id. at 41.
 {¶ 51} On appeal, the United States Supreme Court scrutinized the admissibility of the wife's testimonial hearsay statement under the Confrontation Clause. Id. at 42-50. The Court concluded that "[w]heretestimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." Id. at 68-69 (emphasis added). Accordingly, the Court held that where testimonial evidence is at issue the Constitution requires unavailability and a prior opportunity for cross examination. Id. at 68.
 {¶ 52} While the Court determined that unavailability and prior cross-examination was required for testimonial evidence, the Court also found that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the State flexibility in their development of hearsay law-as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." Id. (emphasis added.) Accordingly, *Page 26 
the Court held that with nontestimonial hearsay the Ohio v. Roberts
(1980), 448 U.S. 56, reliability test still applies.
 {¶ 53} Finally, while the Court in Crawford did not "spell out a comprehensive definition of `testimonial,'" it did give the following examples of what may be included as testimonial statements:
 `[E]x parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' `extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' `statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'
Id. at 51-52. (citations omitted.)
 {¶ 54} Thus, under Crawford, the first issue is whether the testimony is testimonial or nontestimonial. While the Court did not specifically define testimonial, the above examples show that statements made during a police investigation or court proceedings will qualify as testimonial.U.S. v. Cromer (6th Cir.2004), 389 F.3d 662, 672-73. Additionally, it seems that statements made under circumstances that would lead a reasonable person to conclude that such statements would later be available for use at trial also qualify as testimonial under Crawford.Crawford, 541 U.S. at 52; see, also, Cromer, 389 F.3d at 673. *Page 27 
 {¶ 55} Turning to the testimony at issue, Detective Marik provided the following testimony on redirect examination:
 Q: * * * Is it standard procedure at the police department when you know who did it to send for DNA?
 A: If we're sure about who it is, no, we do not go that far.
 Q: Now, one other area here. We've talked a lot about the information you got, the calls you got the next day and the people you talked to the next day that led you believe (Sic.) that this defendant was involved in this. Tell us who those people were, if you can?
 Mr. Fisher: Objection, your honor.
 The Court: Overruled.
 Q: I mean who were those people?
 A: One (1) was his sister and the other would have been Diane — Diane Ross. Tarissa Ross was his sister that had given us that information and Diana Ross, the mother, concurred with that. They had both seen-
 Mr. Fisher: Objection as to what they said, your honor.
 The Court: Sustained.
 Q: And from —
 Mr. Fisher: I think he can say who called but not the content, in other words.
 The Court: That's correct.
 Mr. Berry: He wasn't giving the content. All he said, sir, was that they concurred. We never got to what they said. I think it's appropriate that they both concurred and that's —
 The Court: That's correct but that's as far as it goes.
 Mr. Berry: Yea. Okay. Fine.
(Tr. pp. 381-83).
 {¶ 56} Upon review of the record, we cannot find that Detective Marik gave any specific hearsay testimony. While Detective Marik did state that he received information from Keith's mother and sister, Detective Marik did not repeat any out of court statements either of them made. *Page 28 
 {¶ 57} A trial court's decision on the admissibility of specific evidence is not subject to reversal in the absence of an abuse of discretion. State v. Sage (1987), 31 Ohio St.3d 173, para. two of the syllabus. An abuse of discretion has been described as a judgment that is unreasonable, arbitrary or unconscionable. Blakemore, 5 Ohio St.3d at 219. Thus, we review the trial court's decision to allow Detective Marik's testimony under an abuse of discretion standard.
 {¶ 58} Upon our review of the record, we find that the trial court did not abuse its discretion in allowing Detective Marik's testimony that he received information from Keith's mother and sister identifying Keith in the videotape. First, the trial court limited Detective Marik's testimony to not include what Keith's mother and sister actually said. Second, Detective Marik's testimony was used to explain his course of action in the investigation after being questioned about it during cross-examination. Third, most importantly (and interestingly), Keith was acquitted on the count of aggravated robbery that arose from the robbery at Lynn's. Therefore, even if there was error in admitting the disputed testimony, it was clearly not prejudicial to Keith, as he was found not guilty, even though he was identified in the videotape as one of the robbers of Lynn's.
 {¶ 59} Accordingly, Keith's third assignment of error is overruled.
 {¶ 60} We also note that in Case No. 1-06-46, Keith has filed a notice of appeal from Allen County Common Pleas Court Case No. CR2006 0074. *Page 29 
However, Keith failed to raise any assignments of error related to that case as required under App.R. 16(A)(3). Accordingly, Keith's appeal in Case No. 1-06-46 is dismissed.
 {¶ 61} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued in Case No. 1-06-53, we affirm the judgment of the trial court. Furthermore, the cause in Case No. 1-06-46 is dismissed.
Judgment in Case No. 1-06-53 is affirmed and the appeal in case number1-06-46 is dismissed.
 SHAW and PRESTON, JJ., concur.
[1] Ross is related to Keith.
[2] Andrews was determined to be the taller of the two men and was found guilty of two counts of aggravated robbery in violation of R.C.2911.01(A)(1), both felonies of the first degree, and both including a firearm specification under R.C. 2941.145(A).
[3] We note that both of the jury verdict forms contained the same substantive information with the only difference being the count number. While the State's closing argument clarified which count pertained to which robbery, a better practice would be to include something within the verdict form that would clearly indicate to the jury which count pertained to which robbery.
[4] Evid.R. 702 provides that, in order for a witness' testimony to be deemed that of an "expert", the following requirements must be met:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among laypersons;
 (B) The witness is qualified as an expert by specialization, knowledge, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 (2) The design of the procedure, test, or experiment reliably implements the theory;
 (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.
Even if we construed the basis for Officer Hammond's opinion as satisfying Evid.R. 702(B), we cannot find that the State made any attempt to satisfy subparts (A) and (C) of the rule so as to establish him as an expert witness. *Page 1