[Cite as *State v. Shane*, 2012-Ohio-129.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                 CASE NO. 1-11-31

      v.

DEANNA J. SHANE,                  O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2010 0376

**Judgment Affirmed**

**Date of Decision:   January 17, 2012**

APPEARANCES:

    *Rebecca S. Newman*  for Appellant

    *Jana E. Emerick*  for Appellee

**PRESTON, J.**

{¶1} Defendant-Appellant, Deanna J. Shane (hereinafter "Shane"), appeals the Allen County Court of Common Pleas' judgment entry of conviction. For the reasons that follow, we affirm.

{¶2} On November 10, 2010, the Allen County Grand Jury indicted Shane on count one of robbery in violation of R.C. 2911.02(A)(2), a second degree felony; and count two of theft of an elderly or disabled person in violation of R.C. 2913.02(A)(1) & (B)(3), a fifth degree felony. (Doc. No. 1).

{¶3} On December 1, 2010, Shane filed a written plea of not guilty to both counts. (Doc. No. 5). On April 4, 2011, the matter proceeded to a bench trial, and Shane was found guilty on both counts. (Doc. No. 52).

{¶4} On May 13, 2011, a sentencing hearing was held. (Doc. No. 54). The trial court determined that counts one and two were allied offenses of similar import under *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. (*Id.*). The State elected to proceed to sentencing on the robbery conviction, and the trial court sentenced Shane to 3 years imprisonment on that count. (*Id.*).

{¶5} On June 2, 2011, Shane filed a notice of appeal. (Doc. No. 57). Shane now appeals raising two assignments of error for our review. We elect to address Shane's second assignment of error first.

**ASSIGNMENT OF ERROR NO. II**

**DEFENDANT'S CONVICTION OF ROBBERY AND THEFT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶6} In her first assignment of error, Shane argues that her convictions were against the manifest weight of the evidence. Specifically, Shane argues that the victim gave several inconsistent statements to the police regarding what actually occurred on the date of the alleged incident. Shane further argues that she presented the testimony of four alibi witnesses who all testified that she was passed out drunk at a party during the time of the alleged incident. Finally, Shane points out that a fifth witness testified that he saw Shane a couple days after the alleged incident, and she did not have any markings on her indicative of an altercation; and Shane told him she was at a party that weekend and had too much to drink.

{¶7} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio

App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

{¶8} The criminal offense of robbery is codified in R.C. 2911.02, which provides, in pertinent part: "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another * * *." R.C. 2911.02(A)(2). The criminal offense of theft is codified in R.C. 2913.02, which provides, in relevant part:

> (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * (2) [w]ithout the consent of the owner or person authorized to give consent * * *.
>
> [(B)] (3) Except as otherwise provided in division (B)(4), (5), (6), (7), or (8) of this section, if the victim of the offense is an elderly person or disabled adult, a violation of this section is theft from an elderly person or disabled adult, and division (B)(3) of this section applies. Except as otherwise provided in this division, theft from an elderly person or disabled adult is a felony of the fifth degree.

R.C. 2913.02(A)(2) & (B)(3).

{¶9} The State presented four witnesses at trial. Charles K. Gross testified that he has lived at 442 McPheron Avenue in Lima, Ohio for over fifty years, and that is where he raised his family. (Apr. 4, 2011 Tr. at 8-9). Gross testified that his wife passed away about nine years ago, and he is eighty-eight years of age. (*Id*. at 9-10). Gross testified that he served in the army under General Patton. (*Id*. at 10). Gross testified that he originally met Shane when she came to his house one night around 7:00 p.m. when it was raining and cold outside, and she asked him if she could come in and get warm. (*Id*. at 11). Gross testified that he allowed Shane to come in for a couple hours and then she left. (*Id*.). According to Gross, Shane came back to his house about three or four months later and asked if she could move in with him. (*Id*. at 12). Gross testified that he told her he would think about it, and that Shane offered to pay him money, but he never received any money from her. (*Id*.). Gross testified that, in 2007, Shane stayed with him for six to seven months, and then she came back about a month or two later but did not stay with him at that time. (*Id*. at 12-13, 17). Gross testified that he finally had Shane leave his house after he discovered that she was stealing from him. (*Id*. at 13). Gross testified that he had the sheriff remove Shane from his house. (*Id*. at 13-14).

{¶10} Gross testified that, in September, he was sitting on his front porch when Shane approached him and asked him for a ride home. (*Id*. at 14).

According to Gross, he asked Shane which house she wanted to go to, the one on Harrison or Rice, and Shane indicated the house on Rice. (*Id*. at 14-15). Gross told Shane to get into his car while he locked up the house. (*Id*. at 15). Gross started driving down Eureka and, when he arrived at Elm, Shane jerked the keys out of the ignition and threw them out the window. (*Id*.). Gross testified that Shane started "beating the heck out of [him]" when he got back inside his car. (*Id*.). Gross testified that he hit Shane twice in her left temple, and Shane exited the vehicle stating "I got your money" and "took off down the street." (*Id*.). Gross identified State's exhibits one, two, and three as photographs of him taken after Shane beat him up. (*Id*.); (State's Exs. 1-3). Gross testified that Shane was living with a man named Jesse Latson on Harrison, which was about four and a half blocks from his house. (Apr. 4, 2011 Tr. at 16).

{¶11} On cross-examination, Gross testified that he has known Shane since 2007, and Shane has lived with him off and on for a "long time." (*Id*. at 18). Gross testified that Shane approached him while he was on his porch and asked him to take her home. (*Id*. at 19). Gross testified that he asked her which house, the one on James or Rice, and Shane said the one on Rice. (*Id*.). Gross testified that, on the night of the incident, he was driving on Eureka near Elizabeth, though he reported to the police he was on Eureka near Pine. (*Id*. at 21). When questioned about this discrepancy, Gross testified "I was all shook up. You'd be

all shook up to[o] if you get the hell beat out of ya." (*Id*.). Gross admitted that he incorrectly reported the intersection to law enforcement. (*Id*. at 22). Gross testified that he kicked Shane out of his house after he caught her stealing t-shirts, socks, and a gun. (*Id*. at 23). Gross denied driving by Shane's house looking for her, and he testified that Shane is the one always looking for him. (*Id*. at 27-28). Gross denied having trouble with the ignition to his car prior to the incident, and he testified that he could remove his keys from his ignition. (*Id*. at 30). Gross testified that he was stopped at the corner of Elizabeth and Eureka, and Shane "reached in and she [said] 'I want your money.'" (*Id*. at 31). Gross testified that he was seated in the driver's seat, and Shane was seated in the passenger's seat of the vehicle. (*Id*. at 31-32). On re-direct, Gross testified that, immediately after the incident, he went home and called his daughter to tell her what happened, and his daughter then called the police. (*Id*. at 32).

{¶12} Cheryl Foust testified that Gross was her father, and that she knows Shane "from things she's done to [her] father over the years." (*Id*. at 34). When questioned about her father's relationship with Shane, Foust testified: "my brother and I have told her numerous times to leave him alone but she would just look at us and say she's not going anywhere. She has stolen from him and moved into his house and basically wouldn't leave." (*Id*. at 34). Foust testified that her father obtained an eviction notice to remove Shane from his home, but it took ninety

days to actually evict someone, so Foust called the police and informed them the person staying at the house was Shane. (*Id.* at 35). At that point, the sheriff told Foust to meet him at her father's house immediately, and the sheriff removed Shane from the home on threat of criminal charges. (*Id.*). Foust testified that her father's memory is still very good. (*Id.*). Foust testified that, on September 17, 2010, her father called her and stated:

> "I was just, Dee, Dee, just beat me up and took my money" so and
>
> he said he was on the porch and she came and asked for a ride home
>
> and he said he would so he said he was taking her home and they
>
> stopped at the corner of Eureka and Elizabeth and she was beating
>
> him up and took the little bit of money that he had.

(*Id.* at 36).

{¶13} On cross-examination, Foust testified that both her and her father wanted Shane to leave the house, but Shane ignored them. (*Id.* at 37). Foust denied knowing about her father allowing other women in his home. (*Id.* at 37-38). Foust testified that Shane stole checks and forged them, though Shane was never charged for doing that. (*Id.* at 38-39). On re-direct, Foust identified State's exhibits one, two, and three as the photographs she took of her father the morning after the incident, September 18, 2010. (*Id.* at 40).

{¶14} Rick Foust testified that Cheryl is his wife, and Gross is his father-in-law. (*Id.* at 42). R. Foust testified that he replaced the car ignition to Gross' car since it was broken, and R. Foust further testified that the damage was consistent with someone having jerked the keys out of the ignition. (*Id.*). On cross-examination, R. Foust testified that he was a mechanic in the service in 1968 and has worked on his own cars besides that. (*Id.* at 43). R. Foust could not recall the last time he rode in the vehicle prior to fixing the ignition. (*Id.* at 44). R. Foust denied ever finding Shane in the closet of Gross' home. (*Id.*).

{¶15} Lima Police Detective Timothy S. Clark testified that he talked with Gross about the incident in question, and that Gross' testimony was generally consistent with what he reported to law enforcement. (*Id.* at 46). Clark testified that Gross initially reported that Shane wanted a ride home or to the Alamo, a downtown bar. (*Id.* at 47). Clark further testified that Gross reported over the phone and in-person that the robbery occurred at Eureka and Pine. (*Id.*). Other than those two things, Gross' story has been "pretty consistent," according to Clark. (*Id.*). Clark testified that the incident occurred on September 17, 2010 around 8:00 p.m. (*Id.*). Clark testified that, after he was assigned the case on October 21, 2010, he called Shane, informed her that Gross had made some allegations against her, and she agreed to talk to him at the police department the following day. (*Id.* at 48-49). Clark testified that, at the very beginning of their

-9-

discussion, Shane stated, "[w]hat has he accused me of stealing this time?" (*Id*. at 49). Clark testified that Shane adamantly denied having any contact with Gross on the day in question, and she stated that Gross had accused her of stealing things in the past because she would not spend time with him. (*Id*.). Clark testified that Shane denied needing a ride home since she only lived a few blocks away from Gross, and Shane stated that she never goes to the Alamo bar. (*Id*. at 50). Shane readily admitted that she was a drug user and a prostitute, and Shane said that she would not steal $35 when she could just give someone a "blow job" and get $50. (*Id*.). Clark testified that Shane did not provide him with any alibis during the interview. (*Id*. at 51). Clark identified State's exhibit four as a DVD of his conversation with Shane. (*Id*.).

{¶16} On cross-examination, Clark testified that his investigation report states that the incident took place at Eureka and Pine, and he never corrected the report to state Eureka and Elizabeth. (*Id*. at 52). Clark also testified that there is a discrepancy of where Shane allegedly wanted Gross to take her that night. (*Id*.). Clark testified that he did not ask Shane if she had any alibis during the interview, and that he would probably not have relied upon Shane's memory anyway. (*Id*. at 53). When asked if he would have relied upon the memory of five other people, Clark testified that he would not have put much credibility in any of their testimonies since "they are all admittedly involved in drugs and [] the underbelly

of Lima and in my experience is that I wouldn't put much credibility into anything they said." (*Id*. at 53-54). Clark testified that Shane was "visibly agitated and then became upset" when he showed her the photographs of Gross' injuries. (*Id*. at 54-55). Shane adamantly denied any involvement, according to Clark. (*Id*. at 55). Clark testified that law enforcement officers did not follow-up on the alibi witnesses, though someone from the prosecutor's office did. (*Id*. at 56). Clark testified that, during the course of his investigation, he discovered "at least four maybe five" police reports that Gross filed against Shane. (*Id*. at 56-57). Clark testified that Shane indicated that she had no contact with Gross since the last time Gross filed a police report against her in June or July of 2010. (*Id*. at 58-59).

{¶17} On re-direct, Clark testified that he was familiar with the names of the alibi witnesses—Vera Brown, Jesse Latson, Paul Simpson, Eddie Roberston, and Fred Riley—since those names were "associated with drugs." (*Id*. at 59-60). When asked why he would not put much credence in their testimony, Clark testified that the incident occurred more than a month prior to their statements, and they were involved in drug activity. (*Id*. at 60). Clark testified that Gross had consistently named Shane as the perpetrator, though his recollection of some of the details was not precise. (*Id*.). Clark testified that he accounted Gross' confusion about the details of the robbery to Gross' advanced age. (*Id*.).

{¶18} At this point, the State rested; the State's exhibits were admitted into evidence; Shane made a Crim.R. 29 motion for acquittal, which was denied; and, thereafter, the defense presented the testimony of six witnesses. (*Id*. at 61-65).

{¶19} Fred Riley testified that he lives at 321 Harrison Avenue in Lima, Ohio, and his home has an upstairs apartment which is 321½ Harrison Avenue. (*Id*. at 66-67). Riley testified that the only entrance to the upstairs apartment is an open staircase on the side of the house. (*Id*. at 67). Riley further testified that Jesse Latson has been a tenant in the apartment since he has owned the home, for about a year and a half. (*Id*. at 68). Shane stayed with Latson in the summer of 2010, according to Riley. (*Id*.). Riley testified that he has seen Gross drive by his house looking upward toward the apartment and blowing his car horn. (*Id*. at 70). Riley testified that he figured that Gross was looking for Shane, since he had seen Gross drop Shane off at the apartment several times. (*Id*.).

{¶20} Jesse Latson testified that he has lived at 321½ Harrison for approximately two years. (*Id*. at 72). Latson testified that the apartment was a small upstairs apartment with one entrance/exit from the kitchen to a small outside porch and staircase. (*Id*. at 73). Latson testified that Shane was his "on and off" roommate at the apartment, and Shane lived with him at one point for four to six months. (*Id*. at 74). Latson testified that Shane was living with him in September 2010. (*Id*.). Latson testified that, on September 17, 2010, he hosted a family get-

together in remembrance of his deceased brother Neil. (*Id.* at 75-76). According to Latson, the party started around 11:00 a.m. and around nine or ten people were there, inside the apartment and outside on the porch. (*Id.* at 76-77). Latson testified that Shane was there the whole time, and that Shane was unable to leave the party since she was passed out drunk in the bedroom. (*Id.* at 77-78). Latson estimated that Shane passed out sometime between 6:00 to 7:00 p.m. that night, and she did not wake up until the next day around 3:00 p.m. (*Id.* at 78-79). Latson testified that he could see Shane the whole night because he was sitting so he could keep an eye on her to make sure she was still breathing. (*Id.* at 79). Latson testified that Shane could not have left the apartment without him seeing her leave, and Shane never left that night. (*Id.* at 79-80). Latson testified that Vera Brown, Jeff Maddox, Paul Simpson, and Eddie Robertson were all at the party that night. (*Id.* at 80). Latson testified that he eventually went to sleep around 4:00 a.m., sharing the same bed as Shane. (*Id.* at 81).

{¶21} On cross-examination, Latson testified that Shane was in bed from 6:00 p.m. to 3:00 p.m. the next day. (*Id.* at 82). When asked if he knew when Gross was robbed, Latson testified, "[n]o. I don't know I read [] the motion of discovery I think it said something about twenty two, twenty two hundred hours or something like that I don't know." (*Id.*). Latson testified that he saw the discovery motion because Shane had it in the apartment. (*Id.* at 83). When asked what they

-13-

ate at the party, Latson testified "subs, pizza * * * I don't know just knick knacks like chips, 'tato chips, subs, pizza." (*Id*.). Latson could not recall who ordered the pizza or what time it arrived. (*Id*. at 83-84). Latson testified that he left the party around 4:00 (p.m.) and bought "maybe eight forties, two cases of Milwaukee's best, fifth of gin, fifth of pinnacle * * * vodka." (*Id*. at 84). Latson did not know who ordered the pizza because it was there after he came back from making the beer run. (*Id*.). Latson testified that Maddox left the party first around 5:00 or 6:00 p.m., and his son, Michael, and Michael's friend left around 8:00 p.m. (*Id*. at 85). Latson admitted that he has been convicted of possession of cocaine three times, and that Shane was a cocaine user, though he denied having cocaine at the party. (*Id*. at 86). Latson could not recall what Shane was wearing when she was passed out since she "changed so many times that day she change[d] two or three times that day." (*Id*. at 88). Latson testified that Shane told him about the robbery charge after the police called her, and that Shane never told the police about being passed out drunk at the party since they did not realize the party was the same date of the alleged robbery until afterwards. (*Id*. at 89-90).

{¶22} On re-direct, Latson testified that he drank a couple of forties and a fifth of vodka at the party, but he never passed out, lost consciousness, or took a nap during the day. (*Id*. at 92-93). Latson testified that he remembered the date of the party since it was in remembrance of his deceased brother Neil. (*Id*. at 95).

When the trial court asked Latson what day of the week September 17, 2010 fell on, he testified that it was a Friday. (*Id*. at 95-96).

{¶23} Eddie Robertson testified that he has lived at 533 McPheron Avenue for two to three months. (*Id*. at 96-97). Robertson testified that he has known Shane for six to eight months after meeting her through Latson, a longtime childhood friend. (*Id*. at 97). Robertson testified that, on September 17, 2010, he arrived at Latson's party around 6:00 to 6:30 p.m., and that five to six people were already there by the time he arrived. (*Id*. at 98). According to Robertson, he never left the party that night; instead, he slept in a chair in the front room. (*Id*. at 98-100). Robertson testified that Shane passed out about an hour to an hour and a half after he arrived, and that he could see Shane lying on the bed the whole time he was there. (*Id*. at 101-102). Robertson testified that the party was to celebrate Latson's deceased brother Neil's memory. (*Id*. at 103).

{¶24} When asked on cross-examination how he was approached about testifying, Robertson testified that Latson asked him if he remembered being at the party. (*Id*. at 105). Robertson testified that he ate a cheeseburger and French fries from McDonald's that night, but they also bought "some wing dings and stuff from Meat City and [Latson] had a few greens and some soul food I don't remember exactly what all was there but there was food." (*Id*. at 107). When asked what time Latson left the party to get beer, Robertson testified, "I don't

think anyone had to leave to go get beer because everybody that came was bringin' somethin.'" (*Id*. at 108). Robertson testified that he brought a six pack of Budweiser or Bud Light and a pint of Jose Cuervo tequila to the party. (*Id*.). Robertson testified that Shane was wearing a "slack outfit * * * blue jeans maybe a blouse. I don't remember exactly." (*Id*.).

{¶25} Vera Brown testified that she has known Shane for several years, and that Shane lived on Harrison Avenue with Latson in an upstairs apartment. (*Id*. at 115-116). Brown testified that she came to the party on September 17, 2010 between 4:00 and 5:00 p.m. and stayed there until 8:00 a.m. the next morning. (*Id*. at 117). Brown testified that, between 6:00 and 6:30 p.m., she saw Shane go lay down. (*Id*. at 117-118). Brown testified that Shane might have had a beer while she was there, and Brown testified that she had one King Cobra. (*Id*. at 118). Brown testified that she was sure of the time Shane went to lay down because her cell phone alarm was set for 6:30 p.m. and Shane was in the bed at that time. (*Id*. at 119-120). Brown testified that the bedroom door was "wide open," but later backed off of that statement and said the door was "cracked enough of where [she] could see [Shane]." (*Id*. at 120-121). Brown testified that she never saw Shane leave the house that night. (*Id*. at 121-122). On cross-examination, Brown testified that she did not know what was available to eat at the party, though she saw some chicken wings. (*Id*. at 123). Brown did not recall seeing any pizza at the

party. (*Id*.). Brown testified that Latson contacted her about testifying. (*Id*. at 124). Brown testified that James, Shane, and she stayed the night, and she slept in the chair. (*Id*.). Brown testified that Eddie slept on the floor, and that Jeff did not stay the night but left around 8:00 p.m. (*Id*. at 125).

{¶26} Jeff Maddox testified that he has known Shane for a couple years, and Shane has stayed with him at Harrison Avenue before. (*Id*. at 126-127). Maddox testified that he arrived at the party around 1:00 or 2:00 p.m. on the 16th or 17th of September 2010. (*Id*. at 127-128). Maddox testified that he had five or six beers and left the party around 7:00 to 7:30 p.m. (*Id*. at 129). He testified that he saw Shane go into the bedroom to lie down, and he saw her there when he left the party as well. (*Id*. at 129).

{¶27} Bruce Clum testified that he has known Shane for about five or six years and described their relationship as "boyfriend, girlfriend." (*Id*. at 131-132). Clum testified that he was with Shane for several hours on Sunday, September 19, 2010. (*Id*. at 132-133). Clum testified that he did not notice anything about Shane's appearance that was irregular; he did not see any markings on her hands, any cuts, scrapes, or bruises, or any marks near her temple. (*Id*. at 134). Clum testified that Shane told him about being at a party that weekend and admitted that she had too much to drink. (*Id*. at 135). Clum testified that Shane drank very little around him. (*Id*.). On cross-examination, Clum testified that Shane and he were

"like boyfriend girlfriend, we do things together on the weekends and go out to eat, movies." (*Id*. at 136). Clum testified that Shane has stayed at his house but never lived with him. (*Id*. at 136-137). Clum testified that he saw Shane in September, but he was not sure of the exact date. (*Id*. at 137). On re-direct, Clum testified that he saw Shane the Sunday after his trip to Michigan for the opening day of grouse season, which was September 15, 2010, and that Sunday was September 19, 2010. (*Id*. at 137-138). Clum denied knowing that Shane was a prostitute. (*Id*. at 138-139).

{¶28} After reviewing the testimony, we cannot conclude that Shane's robbery conviction was against the manifest weight of the evidence. At trial, Shane argued mistaken identity; specifically, Shane claimed that she could not have robbed Gross since she was passed out drunk at a party during the time the robbery occurred, presenting the testimony of four alibi witnesses. Consequently, this case ultimately came down to whether the trier of fact believed Gross' story or whether the trier of fact believed the four alibi witnesses who all placed Shane at a party during the time of the robbery.

{¶29} Even when applying the manifest weight standard of review, an appellate court must still allow the trier of fact *appropriate* discretion on the credibility of the witnesses. *DeHass*, 10 Ohio St.2d at 231, 227 N.E.2d 212. Such deference is warranted because "'the trier of fact is in the best position to view the

witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *State v. Kring*, 10th Dist. No. 07AP-610, 2008-Ohio-3290, ¶ 44, quoting *State v. Wright*, 10th Dist. No. 03AP-470, 2004-Ohio-677, ¶ 11. That being said, after reading the testimony presented at trial, we are persuaded that the alibi witnesses lacked credibility for several reasons. To begin with, Brown, Robertson, and Maddox testified that Latson, with whom Shane lived, contacted them about testifying at trial, which might suggest fabrication. Additionally, Detective Clark identified the alibi witnesses as known drug offenders; in fact, Latson admitted that he had three convictions for possession of cocaine. Furthermore, the alibi witnesses consistently refused to give precise details concerning the party, and, when they provided details, the details were different. Some examples of the differences are as follows: Latson testified that they ate pizza, subs, and potato chips; Robertson testified he ate a cheeseburger and French fries from McDonald's, and they had wings from Meat City, greens, and soul food; Brown testified she saw chicken wings but did not see any pizza; Latson testified that Shane passed out between 6:30 to 7:00 p.m.; Robertson testified that Shane passed out anywhere from 7:00 to 8:30 p.m.; Brown testified that she was sure that Shane was in bed by 6:30 p.m. because her cell phone alarm went off at that time; Latson testified that Maddox left the party between 5:00 and 6:00 p.m.; Brown testified that Maddox left the

party at 8:00 p.m.; Maddox testified that he left the party around 7:00 to 7:30 p.m.; Robertson testified that he slept in the chair in the front room right by "the door to the downstairs"; Brown testified *she* slept "in the chair right there as you walk in the door," and Robertson slept on the floor; Brown testified that Robertson "stayed the night" while Robertson testified that he left around 3:00 a.m.; Brown also recalled someone named "James" spending the night, though no one else mentioned that person even being at the party.

{¶30} Gross was not perfectly consistent with details of the incident at trial either; nevertheless, he consistently told both his daughter and law enforcement that Shane attacked him and stole his money. Gross admitted at trial that he incorrectly reported the intersection where the robbery took place to the police because he was shaken up as a result of the incident. Besides Gross' testimony, the State also submitted photographic evidence of Gross' facial injuries—injuries consistent with the attack Gross alleged. The State also presented evidence that Gross' car ignition was broken, and the damage was consistent with the way Gross described the robbery. Shane argues that Gross' testimony was also inconsistent because, at one point, he testified that she "reached in" the vehicle demanding his money and another point he testified that she was riding in the vehicle with him. We do not read Gross' testimony to necessarily mean that Shane was outside the vehicle, and therefore inconsistent, as Shane does. Gross' testimony can be read

simply to mean that Shane "reached in" toward Gross to take his money while she was seated in the passenger seat. In light of the foregoing, we cannot conclude that Shane's robbery conviction was against the manifest weight of the evidence.

{¶31} Shane's second assignment of error is, therefore, overruled.

**ASSIGNMENT OF ERROR NO. I**

**DEFENDANT WAS DENIED HER CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESSES AGAINST HER BECAUSE THE VICTIM WAS HEARING IMPAIRED AND COULD NOT BE THOROUGHLY CROSS-EXAMINED.**

{¶32} In her first assignment of error, Shane argues that she was denied her Sixth Amendment right of confrontation because the victim, Gross, was hearing impaired and could not be "thoroughly" cross-examined.

{¶33} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 38, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The question of whether a criminal defendant's rights under the Confrontation Clause have been violated is an issue of law reviewed de novo. *State v. Turks*, 3d Dist. Nos. 1-10-02, 1-10-26, 2010-Ohio-5944, ¶ 11, citing *State v. Keith*, 3d Dist. Nos. 1-06-46, 1-06-53, 2007-Ohio-4632, ¶ 49, citing *United States v. Robinson*, 389 F.3d 582, 592 (6th Cir.2004).

**{¶34}** Since Shane failed to object at trial on Confrontation Clause grounds, we review for plain error. *Turks* at ¶ 11, citing *U.S. v. Kappell*, 418 F.3d 550, 554 (6th Cir.2005), citing *United States v. Cromer*, 389 F.3d 662, 672 (6th Cir.2004). We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum*, 53 Ohio St.3d 107, 111, 559 N.E.2d 710 (1990), quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Under the plain error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell*, 75 Ohio St.3d 163, 166, 661 N.E.2d 1043 (1996), citing *State v. Moreland*, 50 Ohio St.3d 58, 552 N.E.2d 894 (1990).

**{¶35}** After reviewing the record, we cannot conclude that Shane's Sixth Amendment right of confrontation was violated. Shane does not argue that she was denied an opportunity to cross-examine Gross, but rather, that she was not able to "thoroughly" cross-examine him. "[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *U.S.*

*v. Owens*, 484 U.S. 554, 559, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), quoting *Kentucky v. Stincer*, 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) and *Delaware v. Fensterer*, 474 U.S. 15, 19-20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (emphasis in original). *See also Vasquez v. Lockhart*, 867 F.2d 1056 (8th Cir.1988) (citing *Owens* to reject defendant's claim that the trial was fundamentally unfair when the state's principle witness in a first-degree murder prosecution, the victim's 80-year-old hearing impaired mother, was allegedly unresponsive to questions on cross-examination). Aside from that, Shane's right to confront Gross, while perhaps difficult, was not completely frustrated. The trial court was willing to accommodate defense counsel by allowing her to get closer to Gross when she asked him questions. (Apr. 4, 2011 Tr. at 20). After defense counsel moved closer to Gross, he acknowledged that he could hear her better and answered her questions, even if some of the questions had to be repeated. (*Id*. at 20-32). It is also apparent from reading the transcript that Gross was not trying to be evasive; he admitted he was having difficulty hearing defense counsel (and the prosecutor for that matter), and he was trying to fix his hearing aid during his testimony so he could hear better. (*Id*. at 9, 11, 23-25, 30). As previously mentioned, Gross admitted *during cross-examination* that he incorrectly reported the location of the robbery to law enforcement. Shane was also able to cross-examine Detective Clark, who testified that Gross initially stated that Shane

wanted to go to the Alamo, not to her house on Rice, like he testified at trial. Detective Clark also testified, on cross-examination, that Gross had filed four to five police reports against Shane. Consequently, we are not persuaded that Shane's right to confront Gross was violated in this case, and Shane has failed to demonstrate plain error here.

{¶36} Shane's first assignment of error is, therefore, overruled.

{¶37} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

**Judgment Affirmed**

**WILLAMOWSKI, J., concurs.**

**ROGERS, J. concurs in Judgment Only.**