OPINION
{¶ 1} Defendant-appellant, Marcellus Hudson, appeals his conviction and sentence from the Stark County Court of Common Pleas on one count each of murder and felonious assault, both with firearm specifications. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On December 15, 2006, the Stark County Grand Jury indicted appellant on one count of murder in violation of R.C. 2903.02(B), a felony of the first degree, and one count of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree. Both counts contained firearm specifications. The indictment also contained a count (count three) against Traynal Sherrell charging him with one count of obstruction of justice in violation of R.C. 2921.32(A)(2) and/or (4)(C)(4), a felony of the third degree.
 {¶ 3} At his arraignment on December 22, 2006, appellant entered a plea of not guilty to the charges. A trial was scheduled for May 21, 2007.
 {¶ 4} On May 14, 2007, appellee filed a Motion to Amend the Indictment to include "aid and abet" language in counts one and two and their specifications. A hearing on such motion was held on May 18, 2007. As memorialized in a Judgment Entry filed on May 21, 2007, the trial court granted such motion. While the trial court, at the May 18, 2007, hearing, had offered appellant a continuance for additional preparation due to the addition of the aid and abet language, appellant declined such offer. The following testimony was then adduced at trial.
 {¶ 5} On October 19, 2006, Jennifer Milburn, a mail carrier who was on the second day of her job delivering mail in the northeast section of Canton, Ohio, was *Page 3 
killed when she was struck in the face by a bullet from a .357 Magnum.[1] At the time of the shooting, the victim was on the front porch of a house at 1015 Seventh Street N.E. delivering mail. When Canton Police Officer Jo Ellen Pfeil arrived on the scene, she observed a black 1990's model Chevy Beretta that had crashed into a tree. No one was inside the car and no one was walking down the street or was on their front porches.
 {¶ 6} When Canton Police Officer Robert Flaherty arrived on the scene, he began investigating the crashed vehicle. During his investigation, Officer Flaherty learned that Thomas Williams had told Detective Victor George that he was the passenger in the vehicle.
 {¶ 7} At trial, Charles Johnson, who was seventeen years old at the time, testified that, at approximately 12:30 p.m. on October 19, 2006, he was on Seventh Street and Sandal selling crack. Johnson testified that he sold crack to a man driving a black Beretta that day at approximately 9:00 or 10:00 a.m. According to Johnson, the man walked up to him and asked Johnson if he wanted to rent the man's car in exchange for some drugs. After Johnson gave the man some crack, Johnson drove the man's black Beretta around and drove past the house of Traynal Sherrell. Johnson testified that he knew Sherrell and that he saw someone with Sherrell that morning, although he did not know who the person was. According to Johnson, Sherrell was sitting outside his house with a gun. Johnson testified that he thought that Sherrell might start shooting inside the car because Johnson had had problems with Sherrell in the past. According to Johnson, "he [Sherrell] shoots at us every once in a while." Transcript *Page 4 
at 220. Johnson further testified that the day before, Sherrell was involved in a shooting and that earlier that week, one of Johnson's friends had beat Sherrell up.
 {¶ 8} After driving around in the Beretta for a while, Johnson picked up the man who had loaned him the Beretta. Johnson testified that the man, who he referred to as the "fiend," got into the car on Sandal Street and asked Johnson to go to where Sherrell lived. While the man told Johnson to head down Sandal, Johnson testified that he did not want to turn down Sandal Street because Sherrell was already down there with a gun and Johnson did not have a gun on him. Johnson then turned down Seventh Street. The following is an excerpt from Johnson' testimony at trial:
 {¶ 9} "Q. Why don't you want to go down Sandal?
 {¶ 10} "A. Because he [Sherrell] is already down there with the gun and I didn't have no gun on me.
 {¶ 11} "Q. You don't want to go anywhere near where Traynal is?
 {¶ 12} "A. Yeah.
 {¶ 13} "Q. So which way did you turn?
 {¶ 14} "A. I turn right I would say.
 {¶ 15} "Q. You go up Correll?
 {¶ 16} "A. Turned down Seventh Street.
 {¶ 17} "Q. Then you make a right on Seventh Street?
 {¶ 18} "A. Yeah.
 {¶ 19} "Q. Now, you were heading down Seventh Street. Who was in the car with you?
 {¶ 20} "A. Just me and the fiend (sic). *Page 5 
 {¶ 21} "Q. So your other buddies are out of the car now?
 {¶ 22} "A. Yeah.
 {¶ 23} "Q. Tell these folks what happens when you are driving down Seventh Street.
 {¶ 24} "A. I am driving down. I am talking with the fiend (sic) and I just happened to turn over and see him running down the alley with the gun. And next thing I know he just starts shooting.
 {¶ 25} "Q. See who running down the alley?
 {¶ 26} "A. Him (indicating)
 {¶ 27} "Q. You had seen Traynal out there earlier that morning with the gun?
 {¶ 28} "A. Yeah.
 {¶ 29} "Q. You had seen him before?
 {¶ 30} "A. Yes.
 {¶ 31} "Q. Person you saw running down the alley with the gun, was that the same person you saw earlier that morning hanging out with Traynal?
 {¶ 32} "A. No — yeah, him.
 {¶ 33} "Q. Is that the same person that you pointed to ten minutes ago?
 {¶ 34} "A. Yes." Trial Transcript at 224-225.
 {¶ 35} Johnson identified appellant in the courtroom as the shooter and identified the gun as a big chrome silver gun.
 {¶ 36} Johnson next testified that he ducked down and sped off upon seeing appellant running down the alley with a gun and that he crashed the Beretta into a tree. *Page 6 
Later that evening, Johnson went down to the police station where he picked appellant out of photo array as the shooter.
 {¶ 37} Mike Weidleman, a telephone repairman and installer for ATT, testified that on October 19, 2006, he was working in the area of Gibbs and Sandal when, at around 12:15 p.m., he heard gunshots while sitting in his van eating lunch. Weidleman testified that he heard two shots, then a pause, then three more shots and that the shots sounded like they were from the same large caliber gun. Weidleman then started up his van and started driving westbound on Sandal. At the corner of Correll and Sixth Streets, Weidleman, who was on the phone with police, looked to his left and saw a Blue Tahoe with two people in the front seat and tinted windows "moving very rapidly". Transcript at 296. Weidleman testified that he gave the police a description of the Tahoe and its license plate number. Testimony was adduced at trial that the Tahoe belonged to Traynal Sherrell.
 {¶ 38} Sergeant Kevin Clary of the Canton Police Department testified at trial that he was called to the scene to assist in the investigation of the shooting. Sergeant Clary testified that he photographed the scene and the inside of the Beretta that was crashed around the tree. He further testified that he took blood samples from inside the Beretta and collected a cell phone and a blue cloth ball cap. Sergeant Clary also testified that he later swabbed blood from Thomas Williams' person. According to the sergeant, Williams was bleeding from striking the rear view mirror. Although he searched for bullet holes, Sergeant Clary testified that he did not find any outside or inside the Beretta. Nor did the Sergeant find any shell casings near where the victim was shot. The following *Page 7 
testimony was adduced when Sergeant Clary was asked whether he was able to determine how many shots had been fired:
 {¶ 39} "A. Not a definitive one.
 {¶ 40} "Q. How many are you able to say a number that you know for sure?
 {¶ 41} "MR. JAKMIDES: I'm going to object, Your Honor.
 {¶ 42} "THE COURT: To the extent he knows. It is overruled.
 {¶ 43} "THE WITNESS: I thought three. Two or Three.
 {¶ 44} "MS. HARTNETT: Q. Why is that?
 {¶ 45} "A. Well, one is based on the fact that the victim was struck. That would be one. At 1015 Seventh Street you will see a photograph of the front of the house. There's a bullet hole in the siding. It did not enter the house." Trial Transcript at 327-328.
 {¶ 46} Detective Victor George of the Canton Police Department was the next witness to testify. Detective George testified that when he arrived at the scene, he began canvassing the area for any other witnesses or people with information in reference to the crime and also for shell casings. Based on his interviews with people who lived in the area, Detective George was able to come up with an approximate location of where the shooter was standing. Detective George opined that the shooter was standing on either the west or east side of the porch where the victim was delivering mail.
 {¶ 47} Detective George also testified that from the license plate and description of the Tahoe provided by Mike Weidleman, it was determined that the Tahoe belonged to Traynal Sherrell. He further testified that he was able to determine that both *Page 8 
appellant and Sherrell were in the Tahoe driving away from the area on October 19, 2006, and that appellant later confirmed this with him.
 {¶ 48} Testimony was adduced that while Detective George was at the scene, Thomas Williams walked over and identified himself as the passenger in the Beretta when it crashed into the tree. According to the Detective, Williams had visible injuries on his ear and his head and appeared to be under the influence of drugs or alcohol. From information that they received, the police were able to track down the driver of the Beretta, who was Charles Johnson. Detective George testified that Johnson, who was not high on drugs or alcohol, told him that he would be able to recognize the person who he had seen with the gun and picked appellant out of a photo array. The detective, when asked if Johnson had indicated the area where he had seen the individual with the gun prior to the shooting, further testified that Johnson "described the events that took place that led up to the firing of the gun." Transcript at 355. Based on the evidence that Johnson provided, a warrant was issued for appellant's arrest.
 {¶ 49} At trial, Detective George further testified that, after hearing that police were looking for him, Traynal Sherrell came into police headquarters at around 4:00 p.m. on the day of the shooting. On cross-examination, the Detective testified that he had three separate interviews with Sherrell and that Sherrell, during the same, denied that he fired any shots on the day in question or that he was even outside when the shots were fired. According to Detective George, Sherrell stated that he was inside his residence, which is in the vicinity of the crime scene, taking a bath when the shooting occurred and that, after hearing the shots, he fled in his Tahoe with appellant. The detective further testified on cross-examination that Sherrell indicated that he was *Page 9 
involved in a drug turf war and that he had been beaten up two days before. Testimony was adduced that Sherrell took the gun, a Magnum Revolver, from appellant and threw it out the window as the two were driving down I-77.
 {¶ 50} Testimony was adduced at trial that, after he was arrested, appellant gave a statement to Detective George. In his statement, appellant denied having a gun on the day in question or shooting any gun. Appellant, in his statement, indicated that at around 12:20 p.m. on the day in question, he was returning from the barber shop when he heard shots coming from a dark Beretta. He further indicated that he then took off running and went to Sherrell's house and the two left in Sherrell's truck to go shopping. After Sherrell was advised that the police were trying to pin the murder on him and that the police were pulling every black male over, the two ditched Sherrell's truck.
 {¶ 51} After the trial court denied his motion for judgment of acquittal, appellant called several witnesses in his defense. Trent Chambers testified that he was in the vicinity of 1015 Seventh Street N.E. on October 18, 2006, "in the afternoon, like morning" when he heard gunshots and saw a teenage boy running through the backyard. Transcript at 555. According to Chambers, the boy said he did not know why Traynal was shooting at him. On cross-examination, Chambers could not explain why he told Detective George, during an interview, that the boy did not say anything while running. Fanniecia Brewer testified at trial for the defense. She testified that she was friends with Charles Johnson and that he had told her that Traynal Sherrell's family had paid him "a couple of stacks" to implicate appellant. Transcript at 562.
 {¶ 52} Appellant also called DeMarcus Burt to testify. Burt testified that he knew Traynal Sherrell and was friends with him and that he knew that Sherrell carried a .357 *Page 10 
revolver. DeMarcus testified that he had seen Sherrell shoot a .357 Magnum into the air as late as September of 2006. Defense witness Melvin Howard testified that he lived on Seventh Street N.E. and saw the person who fired the shots on the day in question. He testified that the person was not appellant and that the shooter had a bigger body, was taller and had short black hair.[2] On cross-examination, Howard admitted that he had been found incompetent and that he was unable to see "nothing but both eyes over" the top of the gun. Transcript at 598. At trial, Roderick Hollaman, who was in jail for escape at the time of the trial, testified that he witnessed the shooting and that Traynal Sherrell, who he knew as a "wanna be gangster", had fired the shots. Transcript at 605. He testified that he did not tell police because he had a long-standing feud with them.
 {¶ 53} At the conclusion of the evidence and the end of deliberations, the jury, on May 25, 2007, found appellant guilty of murder and felonious assault. With respect to the two firearm specifications, the jury found that appellant did not have a firearm on or about his person or under his control while committing the offenses and did not display the firearm, brandish the firearm or indicate that he possessed the firearm, or use it to facilitate the offenses, but that he did aid or abet another in so doing. Appellant was sentenced to eighteen years in prison.
 {¶ 54} Appellant now raises the following assignments of error on appeal:
 {¶ 55} "I. THE TRIAL COURT ERRED WHEN IT ALLOWED THE PROSECUTION TO AMEND THE INDICTMENT TO INCLUDE THE LANGUAGE OF AIDING AND ABETTING. *Page 11 
 {¶ 56} "II. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ALLOWING THE `AIDING AND ABETTING' INSTRUCTION TO BE SUBMITTED TO THE JURY.
 {¶ 57} "III. DEFENSE COUNSEL'S FAILURE TO FILE A MOTION TO SUPPRESS INDENTIFICATION TESTIMONY DENIED HIM EFFECTIVE ASSISTANCE OF COUNSEL.
 {¶ 58} "IV. DEFENSE COUNSEL'S FAILURE TO OBJECT TO THE ADMISSION OF CO-DEFENDANT STATEMENTS MADE TO THE POLICE IN VIOLATION OF DEFENDANT'S RIGHT OF CONFRONTATION DENIED HIM EFFECTIVE ASSISTANCE OF COUNSEL.
 {¶ 59} "V. THE GUILTY VERDICT HEREIN ENTERED WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 60} "VI. THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO OBJECT TO THE PROSECUTOR'S USE OF QUESTIONS THAT INSINUATED THAT A DEFENSE WITNESS ATTEMPTED TO UNLAWFULLY INFLUENCE TESTIMONY WHEN THERE WAS NO GOOD-FAITH BASIS TO ASK THOSE QUESTIONS.
 {¶ 61} "VII. DUE PROCESS IS DENIED WHEN PROSECUTOR IS ALLOWED TO ASK A DEFENSE WITNESS WHETHER A PROSECUTOR LIED WHEN CREDIBILITY ISSUES ARE IN THE SOLE PROVINCE OF THE FACT FINDER.
 {¶ 62} "VIII. THE TRIAL COURT ERRED WHEN IT IMPROPERLY LIMITED DEFENSE COUNSEL FROM ARGUING THAT THE STATE'S FAILURE TO UTILIZE *Page 12 
THE TAPES/RECORDINGS WAS PROOF THAT THEY DID NOT HAVE IMPEACHING INFORMATION TO CHALLENGE THE CREDIBILITY OF DEFENSE WITNESSES.
 {¶ 63} "IX. THE TRIAL COURT ERRED WHEN IT GAVE AN IMPROPER CAUTIONARY JURY INSTRUCTION REGARDING THE STATE'S ABILITY TO USE TAPES AS EVDIENCE."
 {¶ 64} "X. THE APPELLANT WAS NOT PROVIDED EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS COUNSEL FAILED TO CALL TRAYNAL SHERRELL IN ORDER TO ESTABLISH A FACTUAL PREDICATE FOR ADMISSION OF TWO DEFENSE WITNESSES TESTIMONY WHO CLAIMED THAT TRAYNAL SHERRELL ADMITTED TO THEM THAT HE COMMITTED THE MURDER AND SET UP THE APPELLANT.
 I {¶ 65} Appellant, in his first assignment of error, argues that the trial court erred when, approximately four days before trial, it granted appellee's Motion to Amend the Indictment to include aiding and abetting language. We disagree.
 {¶ 66} As is stated above, appellee, on May 14, 2007, filed a Motion to Amend the Indictment to include "aid and abet" language. A hearing on such motion was held on May 18, 2007. At the hearing, defense counsel opposed the proposed amendment, arguing that it changed the nature of the allegations and the nature of the case against appellant. Defense counsel argued that the State's theory had always been that appellant was the shooter and that he had never been given any information that appellant may have aided or abetted another person who was the shooter. Appellee, in response, argued, in relevant part, as follows: *Page 13 
 {¶ 67} "MS. HARTNETT: Yes, Your Honor. I would like to state that this is not a new theory. This is not based on any new evidence. This is simply a procedural oversight that was not taken care of at the time that the case was indicted. As the Court and Mr. Jakmides are well aware, any time that we have co-defendants in an incident it is common practice for the aid or abet or other language to be added in the indictment." Transcript of May 18, 2007 hearing at 6-7.
 {¶ 68} The trial court granted the Motion to Amend and indicated that it would grant a continuance so that the defense could have additional time for preparation. The continuance was, however, declined.
 {¶ 69} Crim. R. 7 (D) states, in relevant part, as follows: "The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged."
 {¶ 70} R.C. 2923.03(F), governing complicity, provides that "[a] charge of complicity may be stated in terms of this section, or in terms of the principal offense." As noted by the Ohio Supreme Court inState v. Herring, 94 Ohio St.3d 246, 251, 2002-Ohio-796, 762 N.E.2d 940, "Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is `stated * * * in terms of the principal offense' and does not mention complicity. R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. See State v.Keenan (1998), 81 Ohio St.3d 133, 151, 689 N.E.2d 929, 946, *Page 14 
citing Hill v. Perini (C.A.6, 1986), 788 F.2d 406, 407-408." Thus, as noted by appellee, a complicity charge need not appear in the indictment containing the principal offense.
 {¶ 71} Moreover, as noted by the court in State v. Phillips (Oct. 12, 2001), Cuyahoga App. No 77082, 2000 WL 1513704, "[w]hether a defendant is tried for the crime as a principal or as an accomplice does not alter the name or identity of the crimes charged." Id. at 2.
 {¶ 72} Moreover, we note that the trial court, upon granting the Motion to Amend the indictment, offered to grant appellant a continuance "in order to make sure that there was no prejudice to the Defendant." Transcript from May 18, 2007 hearing at 9. Appellant, however, declined to take advantage of the trial court's offer of a continuance. We find that he cannot now argue that he was prejudiced by the trial court's amendment of the indictment. See, for example, State v. Munday (July 13, 1994), Wayne App. No. 2863-W, 1994 WL 362113.
 {¶ 73} Appellant's first assignment of error is, therefore, overruled.
 II {¶ 74} Appellant, in his second assignment of error, argues that the trial court erred in allowing the aiding and abetting instruction to be given to the jury. We disagree.
 {¶ 75} In the case sub judice, the jury was given an instruction on aiding and abetting. After deliberating for some time, the jury sent a question to the trial court asking whether they must find appellant guilty if they found he aided or abetted. The trial court, outside the presence of the jury, stated on the record as follows: *Page 15 
 {¶ 76} "The Court is going to give them the response as follows: If the State has proven all the elements of the offense or offenses charged in the indictment, and you find the Defendant was the principle [sic] offender or aided or abetted the principle [sic] offender, your verdict must be guilty of the offense or offenses." Trial Transcript at 717. The jury then found that appellant had aided or abetted another in committing the crimes.
 {¶ 77} Appellant now argues that there was insufficient evidence in the record to establish complicity.
 {¶ 78} "When the evidence adduced at trial could reasonably be found to have proven the defendant guilty as an aider and abettor, a jury instruction by the trial court on that subject is proper." State v.Perryman (1976), 49 Ohio St.2d 14, 358 N.E.2d 1040, paragraph five of the syllabus, vacated in part on other grounds by Perryman v. Ohio
(1978), 438 U.S. 911, 98 S.Ct. 3136. "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." State v. Johnson, 93 Ohio St.3d 240,2001-Ohio-1336, 754 N.E.2d 796, at the syllabus.
 {¶ 79} Upon our review of the evidence, we find that the trial court did not err in giving an instruction on complicity. We find that there was sufficient evidence from which the jury reasonably could have found that appellant aided or abetted another in firing the shot that killed the victim in this case. As is stated above, Charles Johnson *Page 16 
testified that, while driving the Beretta earlier that day before the shooting, he saw a man with Sherrell at Sherrell's house. Johnson testified that Sherrell had a gun. He further testified that, while driving down Seventh Street, he later saw the same man running down an alley shooting a gun. Johnson identified appellant as that man in a photo array shown to him on the day of the shooting and also in court.
 {¶ 80} In addition, Mike Weidleman, the ATT repairman, testified that he saw two men leaving the scene in a blue Tahoe after the shooting. The truck was traced to Traynal Sherrell, who told police that he got the gun from appellant and threw the same out of a car window. Finally, appellant's own statements to police placed him in the vicinity when the shooting occurred. Appellant told police that he was on Seventh Street when the shooting occurred. He further told police that he then ran to Sherrell's house and the two left in Sherrell's truck. As noted by appellee, appellant's defense was that Sherrell had shot the victim.
 {¶ 81} Based on the foregoing, we find that the evidence adduced at trial could reasonably be construed to have proven that appellant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crimes of murder and felonious assault. We find, therefore, that the trial court did not err in instructing the jury on complicity.
 {¶ 82} Appellant's second assignment of error is, therefore, overruled.
 III, IV, VI, X {¶ 83} Appellant, in his third, fourth, sixth and tenth assignments of error, argues that he received ineffective assistance of counsel. *Page 17 
 {¶ 84} Our standard of review is set forth in Strickland v.Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Ohio adopted this standard in the case of State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373. These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel. First, we must determine whether counsel's assistance was ineffective; i.e., whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his or her essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. Id. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v. Sallie (1998),81 Ohio St.3d 673, 675, 693 N.E.2d 267.
 {¶ 85} Appellant initially argues, in his third assignment of error, that his trial counsel was ineffective in failing to file a Motion to Suppress Charles Johnson's identification of appellant from a photo array.
 {¶ 86} The failure to file or pursue a motion to suppress does not automatically constitute ineffective assistance of counsel. State v.Madrigal, 87 Ohio St.3d 378, 2000-Ohio-448, 721 N.E.2d 52. Failure to file a motion to suppress can only constitute ineffective assistance of counsel where the record demonstrates that the motion would have been granted. State v. Lee, Franklin App. No. 06AP-226, 2007-Ohio-1594, at ¶ 12, citing State v. Robinson (1996), 108 Ohio App.3d 428,670 N.E.2d 1077. *Page 18 
 {¶ 87} Appellant specifically argues, with respect to his third assignment of error, that a review of the photo array shows that it was not composed of individuals with similar characteristics to appellant and that, for such reason, the array was unduly suggestive.
 {¶ 88} When a witness is shown a photograph of a suspect before trial, due process requires a court to suppress a photo identification of the suspect if the photo array was unnecessarily suggestive of the suspect's guilt and the identification was not reliable. State v. Waddy (1992),63 Ohio St.3d 424, 438, 588 N.E.2d 819, superseded by constitutional amendment on other grounds. The defendant has the burden to show that the identification procedure was unduly suggestive. State v.Harris, Montgomery App. No. 19796, 2004-Ohio-3570, ¶ 19. If the defendant meets that burden, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character. Id., citing State v.Wills (1997), 120 Ohio App.3d 320, 324, 697 N.E.2d 1072.
 {¶ 89} If the pretrial confrontation procedure was not unduly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. Id. at 325. If the court finds the procedure is suggestive, then it must assess the reliability of the identification, considering: (1) the witness's opportunity to view the defendant at the time of the incident, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description, (4) the witness's certainty when identifying the suspect at the time of the confrontation, and (5) the length of time elapsed between the crime and the identification. State v. Davis (1996), 76 Ohio St.3d 107, 113, 666 N.E.2d 1099. A photo *Page 19 
array, "created by police prior to the victim giving a description of the suspect, * * * is not unreasonably suggestive, as long as the arraycontains individuals with features similar to the suspect." (Emphasis added.) State v. Jones, Cuyahoga App. No. 85025, 2005-Ohio-2620, ¶ 15. Where the other men depicted in the photo array with the defendant all appear relatively similar in age, features, skin tone, facial hair, dress, and photo background, the photo array is not impermissibly suggestive. State v. Jacobs, Mahoning Appellate No. 99-CA-110, 2002-Ohio-5240 .
 {¶ 90} Upon our review of the photo array, we concur with appellee that the photo array was not impermissibly suggestive. All of the men in the photo array are African American men with short hair and facial hair. The photo backgrounds are all similar and all of the men are dressed in civilian clothes. None appear in jail uniform. While Charles Johnson did not provide police with a description of the shooter, he did tell police that he could identify the shooter if he saw him. The same day of the shooting, Johnson picked appellant out of the photo array. Based on the foregoing, we find that trial counsel was not ineffective in failing to file a Motion to Suppress Johnson's identification of appellant from the photo array. Because we find that the photo array was not unduly suggestive, any remaining questions as to reliability of Johnson's identification of appellant go to the weight of the identification, not its admissibility. See State v. Willis (1997),120 Ohio App.3d 320, 325, 697 N.E.2d 1072.
 {¶ 91} Appellant next argues, in his fourth assignment of error, that his trial counsel was ineffective in failing to object to Detective George's testimony concerning what Traynal Sherrell, the co-defendant in this case, had allegedly told him about *Page 20 
appellant's involvement in the shooting. Sherrell, who pleaded guilty to obstruction of justice, was not called to testify at trial.
 {¶ 92} Appellant specifically takes issue with the following statements:
 {¶ 93} "Q. And how is it that you determine what suspect pictures to put in with this array of other individuals who look similar?
 {¶ 94} "A. It's the information I got from interviewing Mr. Sherrell.
 {¶ 95} "Q. So you put a picture of Marcellus Hudson in?
 {¶ 96} "A. Yes. Trial Transcript at 356.
 {¶ 97} "Q. Now, you decide to put Marcellus Hudson's picture in that lineup based on information you had obtained from Traynal Sherrell. Traynal hadn't indicated that Marcellus he had seen Marcellus shooting, did he?
 {¶ 98} "A. No.
 {¶ 99} "Q. But he had given you some indication, enough of a reason, to put Marcellus in that lineup?
 {¶ 100} "A. That's correct. Trial Transcript at 358.
 {¶ 101} "Q. Did you have information through the course of your investigation that he [appellant] and Traynal had gone to a location south of Canton at some point in time immediately after the shooting?
 {¶ 102} "A. Yes, information that I got from interviewing Mr. Sherrell, he actually mapped out the area, the actual location where when they left the scene where they went to, whose house they went to, and obtained a ride from that house, left his vehicle there and then went south to a person's house on Fohl Road.
 {¶ 103} "Q. Who was the person? *Page 21 
 {¶ 104} "A. His name is Douglas Kines.
 {¶ 105} "Q. Were you able to interview him at some point in time?
 {¶ 106} "A. Another officer did, yes.
 {¶ 107} "Q. When I say you, I suppose I mean the officers, Canton officers?
 {¶ 108} "A. Yes.
 {¶ 109} "Q. Were you able to verify that Traynal and Marcellus had been down there through your statements or your conversations later with Marcellus and Traynal?
 {¶ 110} "A. Yes, they were.
 {¶ 111} "Q. Both of them indicated that yes, they had, in fact, gone down there, right?
 {¶ 112} "A. That's correct.
 {¶ 113} "Q. And Doug Kines, officers spoke with him and nothing contradicted that?
 {¶ 114} "A. That's correct.
 {¶ 115} "Q. You started developing information as to where from there Marcellus Hudson would have gone or where he could be; is that fair?
 {¶ 116} "A. Yes." Trial Transcript at 359-360.
 {¶ 117} Appellant claims that without an opportunity to confront Sherrell, he was deprived of his Sixth Amendment rights in violation of the rule announced in Crawford v. Washington (2004), 541 U.S. 36,124 S.Ct. 1354.
 {¶ 118} The Sixth Amendment to the United States Constitution states, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]" *Page 22 
 {¶ 119} In State v. Dunivant, Stark App. No. 2003CA00175,2005-Ohio-1497, the Ninth District Court of Appeals, sitting by assignment for this Court, provided a detailed analysis of the issue sub judice:
 {¶ 120} "In Crawford v. Washington, supra, the United States Supreme Court explained that this, the Confrontation Clause, encompasses the concept of `testimonial' statements as determinative of who are `witnesses' for the purpose of such confrontation on questions of hearsay: `Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law-as does [Ohio v. Roberts (1980),448 U.S. 56, 65 L.Ed.2d 597], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.' Crawford v. Washington (2004), 541 U.S. 36,124 S.Ct. 1354, 158 L.Ed.2d 177, 203." Id. at 2.
 {¶ 121} Statements that are not hearsay are not implicated by the confrontation clause because they are not testimonial in nature.State v. Waddell, Marion App. Nos. 9-04-30, 9-04-31, 9-04-32,2005-Ohio-1426, at ¶ 17, citing Crawford, supra.
 {¶ 122} However, an officer's testimony concerning the reasons for his or her actions during an investigation generally is not considered hearsay, because, rather than to prove the truth of the statement made to the officer, it is offered to show why the officer as the testifying witness acted in a particular manner. State v. Williams (1996),115 Ohio App.3d 24, 684 N.E.2d 358; State v. Messer (1995), 107 Ohio App.3d 51,667 N.E.2d 1022; cf., Crawford v. Washington (2004), 541 U.S. 56,124 S.Ct. 1354, *Page 23 158 L.Ed.2d 177. We find that the statements appellant challenges were not hearsay because they were offered to show why Detective George acted as he did in this matter. See State v. Keith, Allen App. Nos. 1-06-46, 1-06-53, 2007-Ohio-4632. In such case, the appellant argued that the trial court had erred in allowing testimony from a detective that the appellant's relatives had contacted the police and identified the appellant from news broadcasts of a video. The appellant argued that his right of confrontation was violated. The Court of Appeals, however, disagreed, noting, in part, that the detective's testimony was used to explain his course of action in the investigation.
 {¶ 123} Furthermore, appellant, in his taped statement to Detective George[3] that was introduced at trial, indicated that he had left the area of the shooting with Sherrell in Sherrell's truck and that they traded the truck for a car. Thus, as noted by appellee, "any testimony of the contents of Sherrell's statement by George as to the flight from the scene of the shooting was duplicated in [appellant's] statement." Assuming, arguendo, that Detective George's testimony was hearsay, we find that it was harmless. Appellant, in his statement to police, admitted that he was with Sherrell immediately after the shooting. He told police that the two left the area in Sherrell's truck after the shooting. Moreover, the information that Sherrell provided to Detective George as to appellant's involvement was vague and did not implicate appellant as the shooter. We cannot find, therefore, that the outcome of appellant's trial would have been different had Detective George's testimony not been admitted. We find, therefore, that trial counsel was not ineffective in failing to object to Detective George's testimony.
 {¶ 124} Appellant, in his sixth assignment of error, argues that trial counsel was ineffective in failing to object to the Prosecutor's cross-examination of Fanniecia Brewer. *Page 24 
 {¶ 125} As is stated above, Brewer testified that she was friends with Charles Johnson and that he had told her that Traynal Sherrell's family had paid him "a couple of stacks" to implicate appellant. The following testimony was then adduced on cross-examination of Brewer:
 {¶ 126} "Q. Well, in fact, Marquis Butler [appellant's girlfriend] called you and asked you to get in touch with Charles Johnson, didn't she?
 {¶ 127} "A. She asked me did I know him.
 {¶ 128} "Q. She asked you would you talk to him, didn't she?
 {¶ 129} "A. She didn't say would I talk to him. She asked me did I know him. I said yeah.
 {¶ 130} "Q. Isn't that true, Fanniecia, that she asked you to get to him?
 {¶ 131} "A. As in?
 {¶ 132} "Q. As in get to him, get him to turn around?
 {¶ 133} "A. No, she just asked me did I know him.
 {¶ 134} "Q. Just did you know him. Now, Fanniecia, would it surprise you to learn that conversations from the Stark County Jail are recorded?
 {¶ 135} "A. Yes.
 {¶ 136} "Q. It would surprise you to learn that?
 {¶ 137} "A. No.
 {¶ 138} "Q. So you know that conversations are recorded from the jail. Would it surprise you to learn that there are at least 11 different phone conversations between Marquis Butler and Marcellus Hudson about you?
 {¶ 139} "A. No. Why would they talk about me? *Page 25 
 {¶ 140} "Q. So it would surprise you to learn that?
 {¶ 141} "A. Yes.
 {¶ 142} "Q. Would it surprise you to learn that they talk about having you get to Charles?
 {¶ 143} "MR. JAKMIDES: Your Honor, I object. There is no foundation for that.
 {¶ 144} "THE COURT: It is overruled.
 {¶ 145} "THE WITNESS: I don't know." Transcript at 565-567.
 {¶ 146} Appellant now contends that trial counsel was ineffective in failing to object to the Prosecutor's improper suggestion that there were recordings of telephone calls between appellant and his girlfriend proving that Brewer was trying to change Charles Johnson's testimony. Appellant argues that there was no good faith basis for such questioning.
 {¶ 147} Contrary to appellant's argument, defense counsel did object after the State, on cross-examination, asked Brewer if she was aware that there were taped recorded conversations from the jail between appellant and his girlfriend discussing having Brewer "get to Charles [Johnson]." After defense counsel objected to such questioning arguing that "there was no foundation for that", the trial court overruled his objection. Trial Transcript at 566-567. We further note that the trial court overruled defense counsel's request for the Prosecutor to play the recordings of the taped conversations for the jury. We find, therefore, that trial counsel was not ineffective with respect to appellant's sixth assignment of error. *Page 26 
 {¶ 148} Appellant, in his tenth assignment of error, argues that trial counsel was ineffective in failing to call Traynal Sherrell as a witness even though Sherrell was available to testify.
 {¶ 149} At trial, defense counsel sought to call two witnesses, both jail inmates, who would testify that they heard Traynal Sherrell confess to committing the murder in this case. The two witnesses were Ryan Jones and Mike Nero. After the State challenged the admissibility of the testimony of these witnesses under Evid. R. 804(b)(3), arguing that Traynal Sherrell was not unavailable, the trial court had Sherrell brought into the courtroom, sworn and voir dired. Sherrell then testified during voir dire that, if called as a witness, he intended to answer all questions posed to him truthfully. Based on the foregoing, the trial court found that Sherrell was available to testify at trial.
 {¶ 150} After learning that Sherrell was not going to plead theFifth Amendment, defense counsel, who had initially called Sherrell as a witness, declined to call him as a witness. The trial court, based on defense counsel's decision, held that defense counsel could not call the two witnesses "who wanted to testify as to the statements made to them by Traynal Sherrell." Transcript at 583. Defense counsel then proffered the statements of these two witnesses as exhibits.
 {¶ 151} We find, however, that trial counsel was not ineffective in failing to call Sherrell as a witness. Testimony was adduced at trial that Sherrell denied he was present when the fatal shots were fired and denied that he fired the shots. Testimony also was adduced that Sherrell told Detective George that he fled the scene with appellant. If called to testify at trial, Sherrell may have hurt appellant's case by further implicating appellant in this matter. We cannot speculate as to how Sherrell would have *Page 27 
testified. As noted by appellee, defense counsel weighed the consequences of the damage that could be potentially caused by Sherrell's testimony against the benefits of the testimony from the two proposed defense witnesses, both who were jail inmates, and made a tactical decision not to call Sherrell. "[Debatable trial tactics do not establish ineffective assistance of counsel." State v. Hoffner,102 Ohio St.3d 358, 365, 2004-Ohio-3430, ¶ 45. We find, therefore, that trial counsel was not ineffective in failing to call Traynal Sherrell as a witness.
 {¶ 152} For the foregoing reasons, appellant's third, fourth, sixth and tenth assignments of error are overruled.
 V {¶ 153} Appellant, in his fifth assignment of error, argues that his convictions for murder and felonious assault and the firearm specifications, are against the manifest weight of the evidence. We disagree.
 {¶ 154} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily *Page 28 
for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, syllabus 1.
 {¶ 155} Appellant specifically contends that Charles Johnson, who identified appellant as being present on the scene and possibly the shooter, was not a credible witness. Appellant notes that Johnson testified about a vendetta with Traynal Sherrell and that Sherrell would shoot at Johnson and his friends sometimes. According to appellant, Johnson's testimony shows that Sherrell "was the only individual with a strong motivation in committing this crime." Appellant also points out that there was testimony that Sherrell made a pay-off to Johnson, that there was evidence that Sherrell had owned and used a .357 Magnum, the gun used in the murder in this case, a month prior to the murder, and that defense witness Melvin Howard testified that appellant was not the shooter. Finally, appellant argues that there was no evidence that he aided and abetted anyone.
 {¶ 156} However, upon our review of the record, we cannot say that the jury, as trier of fact, clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. While appellant argues Johnson was not credible, the jury, as trier of fact, heard all of the testimony, including the testimony that Johnson was allegedly paid to implicate appellant, and still found Johnson to be a credible witness. As is stated above, Johnson testified that he saw appellant with Sherrell the morning of the shooting. In addition, appellant's own statement to the police placed him in the vicinity at the time of the shooting and in Sherrell's truck with Sherrell after. While appellant, in his statement to police, indicated that he was on Seventh Street returning from the barber shop at the time of the shooting and that he got into Sherrell's truck to *Page 29 
go shopping after hearing shots, the jury was free to accept or reject appellant's explanation. Moreover, as is stated above, Mike Weidleman, the ATT repairman, testified that he observed a Tahoe speeding from the scene containing two individuals. The Tahoe was traced to Sherrell. Appellant admitted to being in the Tahoe with Sherrell after the shooting.
 {¶ 157} Based on the foregoing, appellant's fifth assignment of error is overruled.
 VII {¶ 158} Appellant, in his seventh assignment of error, argues that he was denied due process of law due to the Prosecutor's cross-examination of Roderick Hollaman, a defense witness. We disagree.
 {¶ 159} As is stated above, at trial, Roderick Hollaman testified that he had witnessed the shooting and that Traynal Sherrell, who he knew as a "wanna be gangster", had fired the shots. On cross-examination, Hollaman, when asked if he remembered what kind of gun was involved, testified that he was not looking at the gun. When next asked if he remembered talking to a Prosecutor, Hollaman responded affirmatively. Hollaman, when then asked if he recalled telling that Prosecutor, who did not testify at trial, that he saw the gun and that it was a .9 millimeter or a .45, testified that he never said that he saw the gun. The following testimony was then adduced:
 {¶ 160} "Q. Okay. So if that prosecutor were to say that you told them that it was a .9 millimeter or a 45-caliber semi-automatic pistol that you saw, you said you saw, they would be mistaken or not telling the truth?
 {¶ 161} "A. Exactly." Transcript at 614. *Page 30 
 {¶ 162} Appellant now argues that he was denied due process of law when the Prosecutor was permitted to ask Hollaman whether another Prosecutor had lied "when the credibility issues are the sole province of the fact finder."
 {¶ 163} As an initial matter, we note that appellant did not object to this line of questioning. An error not raised in the trial court must be plain error for an appellate court to reverse. State v. Long (1978),53 Ohio St.2d 91, 372 N.E.2d 804; Crim. R. 52(B). In order to prevail under a plain error analysis, appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. Long, supra. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. at paragraph three of the syllabus.
 {¶ 164} The Prosecutor referred to above did not testify at trial. Thus, in contrast to the cases cited by appellant[4], the Prosecutor who questioned Hollaman was not calling for Hollaman's opinion on the credibility of a witness. Furthermore, this was an isolated exchange. Once Hollaman responded "Exactly", there was no further discussion of the issue.
 {¶ 165} In short, we find that this short, isolated comment, when viewed in the context of the entire trial, was not so prejudicial as to warrant a new trial. We concur with appellee that the comment was "harmless, involving a tangential issue, that was not instrumental in the jury finding [appellant] guilty." In short, we find no plain error. We cannot say, based upon the evidence adduced at trial, that the outcome of the trial would have been different but for such alleged error. *Page 31 
 {¶ 166} Appellant's seventh assignment of error is, therefore, denied.
 VIII {¶ 167} Appellant, in his eighth assignment of error, maintains that the trial court erred when, during closing argument, it limited defense counsel from arguing that the State's failure to use the tape recordings of alleged telephone calls from the jail proved that the State did not have impeaching information to challenge the credibility of defense witnesses.
 {¶ 168} In the case sub judice, defense counsel, in closing argument, stated, in relevant part, as follows:
 {¶ 169} "Now, Mr. Howard lives here. He sees the guy to his left. Roderick Hollaman says I have known Traynal Sherrell all my life. It was Traynal firing the shots. I have known him all my life. Then he said well, what about your commissary? What about these tapes? They [the State] didn't play any of these tapes or any phone calls, did they? You know, they didn't subpoena any commissary records to show anything like that did they? Maybe they will tell you why they brought that up if they didn't do those things. They didn't bring any prosecutor in here who had some conversation with him, did they? They didn't do any of those things. They were bluffing. Same way they were with Fanniecia." Trial Transcript at 660-661.
 {¶ 170} With respect to Hollaman and "commissary records," defense counsel was referring to statements adduced during cross-examination of Hollaman. When questioned on cross-examination, Hollaman testified that, while he was in prison, appellant's girlfriend, Marqus Butler, did not send him any money. The following testimony was then adduced: *Page 32 
 {¶ 171} "Q. So if she were to be on some recorded phone calls from the jail saying that she's sending you $50 to put on your books that wouldn't be correct?
 {¶ 172} "A. No, it wouldn't because all you have to do is call Lorain Correctional or Belmont Correctional Facility and have my books subpoenaed and they will show that I received no money." Transcript at 617.
 {¶ 173} After appellee objected to the above statements that defense counsel made during closing arguments, the trial court sustained the objection, stating, in relevant part, as follows:
 {¶ 174} "THE COURT: Just a second. Now, you cannot make statements that are inappropriate under the rules. They could not bring in by extrinsic evidence — if a person denies they cannot bring in by extrinsic evidence. So it isn't a fair statement to indicate why they [appellee] didn't bring them [the allegedly taped telephone calls] in. They couldn't under the rules bring them in." Trial Transcript at 661-662.
 {¶ 175} As an initial matter, we note that it is unclear from the record who the alleged telephone call, which the Prosecutor questioned Hollaman about on cross-examination, was between. While we can infer that the word "she" refers to Marquis Butler, we are unable to determine who the State was indicating that Marquis was speaking to on the recorded phone calls from the jail. In the context of this case, it could have been appellant or Hollaman, we surmise.
 {¶ 176} Assuming, arguendo, that the trial court erred in limiting defense counsel on cross-examination from arguing that the State's failure to use the tape recordings of alleged phone calls from the jail proved that the State lacked impeaching information to challenge the credibility of defense witnesses, we find such error was harmless. We *Page 33 
find that there was strong evidence of appellant's guilt. Testimony was adduced at trial that the bullet taken from the victim most likely came from a .357 Magnum. Charles Johnson testified that he observed a man he identified as appellant with Traynal Sherrell earlier that day and that Sherrell had a gun. Johnson identified appellant as the person who he saw running down the alley and shooting a big chrome silver gun. On the day of the shooting, Sherrell came into police headquarters and denied that he fired any shots on the day in question or that he was even outside when the shots were fired. Testimony also was adduced that Sherrell took the gun, which was indentified as a Magnum revolver, from appellant and tossed it out the window as the two were later driving down I-77.
 {¶ 177} Testimony also was adduced at trial that appellant, in his statement to police, placed himself in the vicinity where the shooting occurred. Appellant told police that he was walking down Seventh Street at the time of the shooting and that, immediately after, he went to Sherrell's. After the shooting, an ATT repair technician saw two men fleeing the scene in a truck belonging to Sherrell. In short, we find that there was overwhelming evidence of appellant's guilt.
 {¶ 178} Finally, the jury heard Hollaman questioned about the tape recordings and would have been aware that no such recordings were played at trial. Therefore, even if appellant's counsel was improperly restricted from making a closing argument regarding the State's failure to produce tape recordings, the jury was aware that the recordings were not produced.
 {¶ 179} Based on the foregoing, we find any error was harmless. *Page 34 
 {¶ 180} Appellant also contends that the State could have used Hollaman's prior statement made to a Prosecutor, that Hollaman saw the gun and that it was a .9 millimeter or a .45, to impeach Hollaman by extrinsic means under Evid. R. 613(B) when he denied in testimony that he ever saw the gun. Because of that, appellant claims he should have been permitted to make a closing argument to point out that the Prosecutor who had the conversation with Hollaman was not called as a witness at trial. As an initial matter, we note that, although appellant refers to tape recordings in his stated assignment or error, there is no indication that Hollaman's conversation with the Prosecutor was recorded. However, we find the subject matter of the statement [i.e.-the caliber of the gun Hollaman saw Sherrell carrying] is not one of consequence to the determination of the action other than the credibility of a witness. Therefore, the Prosecutor's testimony would be impermissible extrinsic evidence. However, assuming, arguendo, that the trial court erred in preventing appellant from arguing that the Prosecutor who had the conversation with Hollaman was not called as a witness, we find such error harmless based on the evidence of guilt.
 {¶ 181} Appellant's eighth assignment of error is, therefore, overruled.
 IX {¶ 182} Appellant, in his ninth assignment of error, argues that the trial court erred when it gave an improper cautionary instruction to the jury regarding the State's ability to use tape recordings as evidence.
 {¶ 183} In the case sub judice, after sustaining the State's objection to defense counsel's argument, during closing, that the State's failure to use the tapes of the alleged telephone calls from the jail proved that the State did not have impeaching *Page 35 
information to challenge the credibility of defense witnesses, the trial court gave the following curative instruction to the jury:
 {¶ 184} "THE COURT: Ladies and gentlemen, I am going to caution you with regard to argument. Number one, it's what the lawyers believe the evidence will show or hasn't shown. There are rules of evidence that guide both parties and the Court with regard to testimony, and one of them deals with the ability to bring in extrinsic evidence tapes if it has been denied on the stand.
 {¶ 185} "So it's not a fair statement to say the State did not do something or did do something. The rules of evidence guide what they can and cannot do. So I am trying to be fair to both sides so disregard those comments made by Mr. Jakmides. Let's proceed." Trial Transcript at 664.
 {¶ 186} Essentially, the court told the jury that it was not fair for defense counsel to argue that the jury should conclude the State didn't have certain evidence (i.e. tape recordings) because the State didn't produce it, when the rules of evidence may have made such evidence inadmissible. Even if the trial court was incorrect, regarding its conclusion on this type of extrinsic evidence, we find the error to be harmless.
 {¶ 187} The jury never heard any tape recordings, and, so, the content of those recordings would not be evidence. The most the jury could conclude from the trial court's cautionary instruction was that the State would have been unable to introduce that evidence, if it existed, because the rules of evidence would not allow it. Defense counsel wanted to jury to conclude that the evidence did not exist. Regardless of the reason for the non-production of that evidence by the State, the jury did not hear the *Page 36 
evidence and could not consider evidence they didn't hear. Therefore, we conclude said error, if any, was harmless.
 {¶ 188} Appellant's ninth assignment of error is, therefore, denied.
 {¶ 189} Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.
 Edwards, J. Hoffman, P.J. and Wise, J. concur. *Page 37 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] Michael Short, a criminalist, testified that the bullet taken from the victim "is most likely from a .357 Magnum Caliber cartridge." Transcript at 434.
[2] At the time of the shooting, appellant had short hair while Sherrell wore his hair in short dreadlocks.
[3] The taped statement was admitted at trial as State's Exhibit 21.
[4] In United States v. Sanchez, 176 F.3d 1214 (9th Cir. 1999), cited by appellant, the court held that compelling a defendant to call a government agent who had testified earlier a liar was improper.